# IN THE SUPREME COURT OF TEXAS

No. 16-0842

ANDREW ANDERSON, PETITIONER,

v.

JERRY V. DURANT, JERRY V. DURANT, INC. D/B/A DURANT TOYOTA AND D/B/A
JERRY DURANT TOYOTA, JERRY DURANT HYUNDAI, LLC, DOYLE MAYNARD,
AND ROBERT G. COTE, SR., GARY MICHAEL DEERE, JERRY RASH,
AND ELLIOT "SCOOTER" MICHELSON, RESPONDENTS

ON PETITION FOR REVIEW FROM THE
COURT OF APPEALS FOR THE SECOND DISTRICT OF TEXAS

**Argued February 27, 2018**

JUSTICE GUZMAN delivered the opinion of the Court.

JUSTICE LEHRMANN did not participate in the decision.

After a decade of successful employment with Jerry Durant Auto Group, Andrew Anderson's employer offered him an oral deal to "buy in" to the business in exchange for undertaking management of two underperforming automobile dealerships. What seemed like the opportunity of a lifetime soon became Anderson's nightmare after he was falsely accused of taking illegal kickbacks on used-car acquisitions and lost his job. Rumors of Anderson's alleged misdeeds quickly spread in the closely connected auto industry, and Anderson, who was unemployed for months, was unable to obtain comparable employment. He sued his employer and several individuals for

defamation, and because the buy-in transaction never came to fruition, he also sued his employer for breach of contract and fraudulent inducement.[1]

The terms, but not the existence, of the buy-in offer were vigorously disputed. Anderson claimed the offer was firm and included a ten-percent interest in both dealerships and associated real-estate interests while his employer maintained the offer was contingent and limited to a ten-percent interest in only one of the dealerships. At the conclusion of a lengthy trial, the jury found Anderson's employer defrauded him and the defendants defamed him, but did not find that Anderson and his employer agreed to a buy-in deal that included interests in both the dealerships and their underlying real estate. The jury awarded Anderson $2.2 million in defamation damages, $383,150 in fraud damages based on a ten-percent ownership interest in both dealerships, and zero fraud damages for the value of a ten-percent interest in the real property. The trial court rendered judgment on the jury's verdict, but the court of appeals reversed and rendered a take-nothing judgment.[2]

The issues presented here are (1) whether the jury's failure to find that the parties agreed to the specific contract terms submitted in the contract question (dealership interests plus real-estate interests) precludes Anderson from recovering the value of the disputed dealership interests as benefit-of-the-bargain damages under a fraud theory that requires proof of an enforceable contract and (2) whether the evidence is legally sufficient to support the defamation damages the jury

---

[1] Other claims, counterclaims, and cross-claims for conspiracy, conversion, breach of fiduciary duty, negligent misrepresentation, promissory estoppel, quantum meruit, attorney's fees, and exemplary damages are not at issue on appeal.

[2] 2016 WL 552034, at *1 (Tex. App.—Fort Worth 2016).

2

awarded. As to the first issue, we hold that the fraud liability question incorporated the required elements of a contract; the record contains legally sufficient evidence of an enforceable promise to provide Anderson a ten-percent ownership interest in the two dealerships in exchange for leaving a more secure management position; and no findings render the exchange unenforceable or otherwise conflict with the jury's fraud findings. As to the second issue, legally sufficient evidence supports the damages awarded for loss of reputation and mental anguish in the past, but no evidence supports the existence of future damages or a finding that the kickback allegations caused any lost-income damages. We therefore affirm the court of appeals' judgment in part, reverse in part, and remand the case to that court for further proceedings.

## I. Background

Jerry Durant is the majority shareholder in Jerry Durant Auto Group, Inc., which owns five dealership entities including Jerry Durant, Inc., doing business as Durant Toyota and Jerry Durant Toyota (Durant Toyota), and Jerry Durant Hyundai, LLC (Durant Hyundai) (collectively Auto Group).[3] Andrew Anderson began working for Auto Group in 2001 as a used-car manager and at all times was an at-will employee.

During the course of his decade-long tenure with the company, Anderson's career flourished. At the mid-way point, Anderson assumed the General Manager mantel at an Auto Group dealership in Weatherford, Texas and was appointed to Auto Group's board of directors. Five years later, in early 2011, Durant offered Anderson a deal to "buy in" and become part owner of the business. The

---

[3] Auto Group was not incorporated until 2007, but all references to Auto Group in this opinion include predecessor businesses consolidated into Auto Group.

3

buy-in agreement was never reduced to writing, and as often happens in such cases, the terms of the deal are disputed.

According to Anderson, Durant offered him the opportunity to be the "dealer owner/operator" of two dealerships in Granbury, Texas—Durant Toyota and Durant Hyundai. In exchange, Anderson would immediately receive a ten-percent ownership interest in those dealerships and the land on which they sit, with one caveat: Anderson would have to leave his relatively secure position in Weatherford and assume management responsibility for the historically struggling Toyota and Hyundai franchises.

Durant describes a different deal. Durant says he offered Anderson a general manager position at both Granbury dealerships and the opportunity to earn a ten-percent ownership interest in Durant Hyundai if—and only if—the store had a net profit of $400,000, a metric Durant considered "achievable" despite a $250,000 loss the previous year. As Durant tells it, this deal did not include any real-estate interests nor any interest in Durant Toyota and was subject to Hyundai's approval of Anderson becoming an owner. Around the same time, Durant made similar agreements with two other managers, both of which included a minimum-profit condition, did not include real-estate interests, and were reduced to signed writings.

Whatever the deal was, Anderson accepted it and moved to Granbury to begin managing the Hyundai and Toyota dealerships. Shortly after Anderson's arrival, a press release and marketing materials heralded him as a "partner/principle [sic]" of the "Jerry Durant Auto Group—Granbury Division." Durant disclaimed responsibility for these publications, but not contemporaneous knowledge of them. Yet Durant made no effort to correct any misunderstanding about Anderson's

4

position, even though he and another Auto Group shareholder were both photographed with Anderson for the marketing materials. Anderson also alleges that Durant introduced him to a Toyota executive and asked the executive to begin separating the Granbury location from the Weatherford location so Anderson could acquire an interest in the Granbury Toyota dealership. But Anderson never acquired an interest in any Auto Group dealership and, within months, would be out of a job and under a cloud of suspicion.

Starting in December 2011, the events precipitating this lawsuit unfolded fast and furiously. In early December, Durant called a meeting of all managers and announced he had reached a deal in principle to sell his dealerships for $44 million. Durant said the managers with buy-in agreements would be "taken care of," but he did not explain what that meant, and Anderson did not ask. Days later, at the company Christmas party, Durant pulled the managers with buy-in agreements aside, told them the preceding twelve months had been the most profitable in Auto Group's history, and gave each of them a check for $75,000, Anderson included. The purpose of this payment is a matter of dispute. According to Durant, the $75,000 checks were in lieu of the managers' buy-in interests. Anderson, however, viewed the payments as Christmas bonuses and said neither Durant nor anyone else communicated that the checks were intended to compensate the managers for their buy-in interests.

Under Durant's version of the buy-in deal, Anderson should not have received a payment for his buy-in interest because the Hyundai dealership had not achieved the $400,000 net-profit required for a buy-in interest. But Durant said he included Anderson in the buy-out payments simply because he is "a generous man" who "tr[ies] to take care of [his] employees."

5

The spirit of generosity was short-lived. Within days, Durant assembled the used-car managers and salesmen and publicly accused Anderson of mismanaging inventory and buying cars directly from wholesalers rather than at auction as company policy mandated. Afterwards, Durant met privately with Anderson to reprimand him about buying cars from a particular wholesaler despite specific instructions not to do so. A company executive also informed Anderson that Durant asked him to review all of Anderson's car deals while at Granbury.

In a follow-up meeting just before the close of the year, Durant accused Anderson of taking kickbacks on fifteen cars purchased wholesale and claimed Auto Group had lost about $30,000 because of these transactions. Anderson denied taking kickbacks but offered to cover any losses. Because Anderson denied violating company policy, Durant asked Anderson to take a polygraph test.

The results of the polygraph test were inconclusive, but Anderson reported to Durant that his own investigation showed no losses on the transactions. Anderson therefore rescinded his offer to repay the alleged losses, stating "it's wrong, Boss. It's wrong." Durant replied, "if you think that's wrong, you can hit the dirt," which Anderson understood to mean he was fired. Anderson left and never returned to work. Durant later admitted he had suspicions but no evidence that Anderson ever took kickbacks, and Anderson subsequently passed a second polygraph test on the matter.

The car-selling industry being a small and close-knit community, rumors quickly spread about Anderson's termination and the accusations that he had accepted kickbacks. Anderson admitted he talked about the accusations himself, telling a few personal friends. Anderson also discussed the kickback allegations with others in the local auto industry, including prospective

6

employers, some of whom may have already known. Anderson, unable to immediately secure regular employment for approximately ten months, worked on a contractual basis for various third parties until he acquired permanent employment at a significantly lower salary.

Within a month after his employment had terminated, Anderson sued Auto Group for breach of contract and fraud with respect to the unfulfilled buy-in agreement and asserted defamation per se claims against Auto Group and myriad individuals arising from the false kickback allegations.

After a seven-week trial, the case was submitted to the jury on a hotly contested jury charge. The charge included almost fifty questions (not including subparts), and the parties have parried over several of its aspects. But in regards to the jury charge, this appeal concerns only the relationship between the breach-of-contract and fraud findings.

Jury Questions No. 1 through No. 8 relate to Anderson's breach-of-contract claim, with Question No. 1 inquiring as to the existence of an agreement on the following terms:

> [D]id Jerry Durant . . . agree to immediately provide Andrew Anderson a 10% ownership interest in both the Durant Toyota and Durant Hyundai dealerships . . . and agree to immediately provide Andrew Anderson a 10% ownership interest in the real estate associated with both the . . . dealerships . . . in exchange for Andrew Anderson becoming General Manager for the . . . dealerships . . . ?

Anderson had requested a bifurcated question that asked first whether an agreement existed as to the dealership interests and second whether the terms of the agreement included real-estate interests. The trial court denied Anderson's proposed questions and rejected Auto Group's objection that no evidence supported a contract submission at all.

Questions No. 9 and No. 10 address Anderson's fraud claim and follow the Texas Pattern Jury Charge in instructing the jury that fraud requires a "material misrepresentation," which includes

7

"a promise of future performance made with an intent, at the time the promise was made, not to perform as promised." The fraud-damages question asked the jury to determine the amount that would compensate Anderson by separately valuing a ten-percent ownership interest in each dealership and in each parcel of associated real estate. The fraud-liability question was not conditionally submitted on an affirmative finding to Question No. 1, and no party objected.

During deliberations, the jury expressed frustration with Question No. 1, inquiring: "Is this an all or nothing question? Both dealerships—and both land associated with them?" The jury also requested the question be broken into two parts so they could answer separately whether "Durant agree[d] to immediately provide [Anderson] a 10% ownership of Durant dealerships" and whether he agreed to provide "a 10% ownership in the real estate." The trial court responded that, "[t]o answer 'yes' to this question, the jury must find an agreement regarding both dealerships and both parcels of real estate."

The jury answered Question No. 1 in the negative and therefore did not answer the remaining breach-of-contract questions. However, the jury found in Anderson's favor on his fraud and defamation claims. For fraud damages, the jury awarded Anderson $323,150 as "[t]he value of a 10% ownership interest in the Durant Toyota dealership in Granbury, Texas, excluding the value of the associated real estate" and $60,000 as "[t]he value of a 10% ownership interest in the Durant Hyundai dealership in Granbury, Texas, excluding the value of the associated real estate." The jury awarded zero damages for the value of a ten-percent ownership interest in the real estate associated with the two dealerships. Defamation damages totaled $2.2 million—$400,000 for injury to reputation in the past, $400,000 for future injury to reputation, $400,000 for past mental anguish,

8

$400,000 for future mental anguish, and $629,000 for past and future lost income. The trial court rendered final judgment on the jury's verdict.

The jury did not find all defendants liable, and some of the individual defendants settled during trial. The remaining defendants—Auto Group (Durant, Durant Toyota, and Durant Hyundai) and individual defamation defendants (Doyle Maynard, Robert G. Cote, Sr., Gary Michael Deere, Jerry Rash, and Elliot Michelson) (collectively, Respondents)—appealed. Though the Respondents presented numerous points of error, the court of appeals considered only the issues concerning (1) Auto Group's liability for fraudulent inducement absent an express and independent contract finding and (2) legal sufficiency of the evidence to support defamation damages. First, the court held that an independent finding of an enforceable agreement was required to recover benefit-of-the-bargain damages on the fraud claim; the jury's negative answer to Question No. 1 could not have supplied that finding; the court could not infer the jury found an enforceable agreement via the fraud findings; and the fraud recovery therefore failed for want of a viable damages measure.[4] Second, the court held no evidence supported the damages awarded for defamation.[5] Finding no recoverable damages under either theory of recovery, the panel unanimously reversed the trial court's judgment and rendered a take-nothing judgment without addressing the Respondents' other issues.

---

[4] 2016 WL 552034, at *3.

[5] *Id.* at *5-8.

9

Anderson's combined motion for rehearing and rehearing en banc was denied over the dissent of an original panel member.[6]  Addressing only the fraud recovery, the dissenting justice argued (among other things) that the panel misapplied our recent decision in *Zorrilla v. Aypco Construction II, LLC,*[7] by requiring a separate contract finding to sustain a fraudulent-inducement recovery despite evidence of an enforceable promise to provide Anderson a ten-percent ownership interest in the two dealerships.[8]  *Zorrilla*, the dissent said, held that virtually identical fraud submissions—which tracked the Pattern Jury Charge—incorporated the requisite elements of a contract, obviating the need for Anderson to procure an independent finding of an enforceable contract to recover benefit-of-the-bargain damages.[9]

## II. Fraudulent Inducement

We first consider whether Anderson is precluded from recovering benefit-of-the-bargain damages on his fraudulent-inducement claim either because he failed to secure a separate jury finding of an enforceable agreement or because the jury's negative answer to Question No. 1 conflicts with the fraud findings.  We conclude the court of appeals erred in denying Anderson's fraud recovery on these bases.

---

[6] 2016 WL 7157244, at *1 (Tex. App.—Fort Worth Sept. 8, 2016) (Gardner, J., dissenting to denial of rehearing en banc).

[7] 469 S.W.3d 143 (Tex. 2015).

[8] 2016 WL 7157244, at *6-7.

[9] *Id.*

Texas law has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations.[10]  Fraudulent inducement is a species of common-law fraud that shares the same basic elements:  (1) a material misrepresentation, (2) made with knowledge of its falsity or asserted without knowledge of its truth, (3) made with the intention that it should be acted on by the other party, (4) which the other party relied on and (5) which caused injury.[11] Fraudulent inducement is actionable when the misrepresentation is a false promise of future performance made with a present intent not to perform.[12]  Because fraudulent inducement arises only in the context of a contract, the existence of a contract is an essential part of its proof.[13]

Two types of direct damages are available for common-law fraud:  out-of-pocket damages, measured by the difference between the value expended versus the value received, and benefit-of-the-bargain damages, measured by the difference between the value as represented and the value received.[14]  The former is rooted in restitutionary theory while the latter, which is based on an expectancy theory, allows recovery of profits that would have been realized had the bargain been performed as promised.[15]  Both damages measures are available for fraudulent inducement, but

---

[10] *Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001).

[11] *See Zorrilla*, 469 S.W.3d at 153; *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 47 (Tex. 1998) (op. on reh'g).

[12] *Formosa Plastics*, 960 S.W.2d at 48.

[13] *See Haase*, 62 S.W.3d at 798.

[14] *Zorrilla*, 469 S.W.3d at 153.

[15] *Id.*

11

if a promise to perform is unenforceable, the benefit-of-the-bargain measure is not available because one can have no compensable expectancy from a bargain that is not binding.[16]

The requirement of an enforceable bargain does not, however, mean the defrauded party must procure a finding of enforceability separate and apart from favorable fraudulent-inducement findings. The court of appeals held otherwise, citing our decision in *Zorrilla* and pointing to the jury's failure to find that Anderson and Durant agreed to all the contract terms included in Question No. 1.[17] This was error.

Rather than being compelled by *Zorrilla*, the court of appeals' holding is at odds with it. *Zorrilla*, like here, involved claims for breach of contract and fraudulent inducement.[18] The jury found for the plaintiff on both claims.[19] The fraudulent-inducement submission was based on the Pattern Jury Charge and was nearly identical to the charge in this case.[20] The defendant argued that because a fraudulent-inducement claim requires the existence of an enforceable contract, the court of appeals erred in failing to consider her evidence-sufficiency challenges to the breach-of-contract findings before upholding the fraudulent-inducement judgment.[21] We disagreed, holding "[t]he fraud questions submitted to the jury incorporate[d] the requisite elements of a contract—promise,

---

[16] *Haase*, 62 S.W.3d at 798, 800 (finding fraudulent-inducement claim could not be premised on an agreement unenforceable under the statute of frauds).

[17] 2016 WL 552034, at *3 (Tex. App.—Fort Worth 2016).

[18] *Zorrilla*, 469 S.W.3d at 149.

[19] *Id.* at 150.

[20] *See id.* at 153 (citing Texas Pattern Jury Charges (Business) 105.1–105.3B (2010) and Texas Pattern Jury Charges (Business) 105.1–105.3B (2012)).

[21] *Id.* at 152.

12

reliance, and an agreement," which the jury found in the plaintiff's favor based on sharply conflicting evidence.[22] The defendant did not obtain a finding or conclusively establish the promise was unenforceable, so the jury's fraudulent-inducement findings were a sufficient basis to uphold the fraud judgment and an award of benefit-of-the-bargain damages, regardless of the defendant's evidentiary challenges to the breach-of-contract finding.[23]

The same analysis applies here. The jury answered the fraud-damages question in Anderson's favor, and like *Zorrilla*, the fraud-damages question submitted only a benefit-of-the-bargain measure of damages by inquiring about the value of the dealerships and real estate Anderson claimed. The jury was not asked to determine the amount of fraud-related out-of-pocket damages, such as costs Anderson may have incurred to move to Granbury. Anderson's fraud recovery is therefore sustainable only if he secured jury findings of an enforceable contract as necessary to support a fraudulent-inducement claim. We hold the jury's findings in response to the fraud-liability question are sufficient to support the verdict because, as in *Zorrilla*, the submission encompassed the required elements of a contract, legally sufficient evidence supports the jury's finding that the parties struck a bargain for a ten-percent interest in the dealerships alone, and no jury findings render that promise unenforceable.[24]

---

[22] *Id.* at 154.

[23] *See id.*

[24] *Compare id.* (no submission inquired whether the parties agreed to a contract term requiring contract modifications to be in writing, which the defendant argued rendered any oral promise to perform unenforceable), *with Haase v. Glazner*, 62 S.W.3d 795, 800 (Tex. 2001) (promise to perform was unenforceable under the statute of frauds).

13

Auto Group argues *Zorrilla* is distinguishable because in addition to finding in the contractor's favor on fraud, the *Zorrilla* jury also answered a separate contract question in his favor,[25] whereas in this case, the jury answered the separately submitted contract question in the defendants' favor. This distinction is accurate, but legally irrelevant. As in *Zorrilla*, the evidence here conflicted as to whether the parties agreed to a particular term—the real-estate interest. The contract question restricted the jury to a particular iteration of the terms: an immediate ten-percent interest in both dealerships *and* a ten-percent interest in the real estate associated with them.[26] But the fraud question did not similarly restrict the jury, allowing a finding of fraudulent inducement based on any promise of future performance supported by the evidence. The contract and fraud findings do not conflict because the jury reasonably could, and evidently did, find an agreement involving the dealerships, but not the land. The jury's answer to Question No. 1 is thus irrelevant to the fraudulent-inducement analysis.

Auto Group asserts that, if Anderson intended the fraud question to encompass terms differing from those submitted in the breach-of-contract question, he should have requested an instruction to that effect or appealed the adverse breach-of-contract finding. These arguments fail. Auto Group requested a proper broad-form fraud submission that followed the Pattern Jury Charge, and without contrary request or objection, the fraud questions were not conditionally submitted based on an affirmative answer to the breach-of-contract question. Consistent with *Zorrilla*,

---

[25] 469 S.W.3d at 150.

[26] Anderson requested a question that would allow the jury to find a contract that did not include a real-estate interest, but he does not argue on appeal that the trial court's refusal of that submission was error.

14

Anderson secured the findings necessary to prevail on his fraudulent-inducement claim, and his failure to appeal the adverse breach-of-contract finding is irrelevant.

Auto Group contends no evidence supports a finding that the parties agreed to a contract for only both dealership interests without a corresponding land interest in each. Because Durant said the deal included only one dealership interest and no land while Anderson said it included dealership and land interests, Auto Group asserts the jury had to find one or the other rather than an agreement based on a hybrid of the evidence. This argument misunderstands the nature of a legal-sufficiency review and our duty to reconcile purportedly conflicting jury answers.

In a no-evidence review, we view the evidence in the light most favorable to the verdict, disregarding evidence contrary to the verdict unless a reasonable jury could not.[27] More than a scintilla of evidence exists when reasonable and fair-minded people could reach different conclusions based on the evidence.[28] When evidence conflicts, the jury's role is to evaluate the credibility of the witnesses and reconcile any inconsistencies,[29] and as a general proposition, the jury may "believe all or any part of the testimony of any witness and disregard all or any part of the testimony of any witness."[30] We must uphold the jury verdict if any reasonable version of the evidence supports it. Moreover, when evaluating a jury's verdict, our duty is to "reconcile apparent conflicts in the jury's findings if reasonably possible in light of the pleadings and evidence, the

---

[27] *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005).

[28] *Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014).

[29] *See id.* at 819-20.

[30] *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 774-75 (Tex. 2003) (citation and internal quotation marks omitted); *see also City of Keller*, 168 S.W.3d at 819-20.

15

manner of submission, and the other findings considered as a whole."[31]  If we can reasonably

construe the findings in a way that harmonizes them, we must do so "when possible."[32]  Considering

the charge as a whole in light of the record, that is an easy task in this case.

Although Anderson testified the buy-in agreement included an interest in both the

dealerships and the associated land, the evidence conflicted on those points, and the jury was free

to reconcile the inconsistencies.  The jury could believe testimony that Durant promised an

immediate interest in both dealerships but also believe conflicting testimony that the agreement

never included any land.  And the record demonstrates that this bargain—one not including

real-estate interests—is exactly what the jury found.  First, during deliberations, the jury inquired

whether the question was "an all or nothing question" and asked the trial court to separate the

breach-of-contract question into two parts—the dealership interests and the real-estate

interests—which the court refused with the instruction that "[t]o answer 'yes' to [the

breach-of-contract question], the jury must find an agreement regarding both dealerships and both

parcels of real estate."  Second, in response to the fraud-damages question, the jury awarded

damages for the dealership interests but not the real-estate interests.  The jury could—and did—find

both that (1) the evidence of a promise to convey ownership interests in both the dealerships and the

land was unpersuasive, but (2) the evidence of a promise to convey an ownership interest in the

dealerships was credible.  This interpretation reconciles the jury's finding in Questions No. 9 and

---

[31] *Bender v. S. Pac. Transp. Co.*, 600 S.W.2d 257, 260 (Tex. 1980) (citation and internal quotation marks omitted).

[32] *Id.*

16

No. 10 that Durant made "a promise of future performance" that was different in terms than the agreement described in Question No. 1.

Finally, Auto Group argues Anderson waived his fraudulent-inducement claim because he disavowed fraudulent inducement in the court of appeals by arguing "[t]he fraud claim that was pleaded, tried, and submitted to the jury was common law fraud, *not* fraudulent inducement based on an oral contract." We are generally hesitant to find waiver and, when possible, construe briefing "reasonably, yet liberally, so that the right to appellate review is not lost by waiver."[33] In that vein, we treat an appellant's statement of an issue or point as covering every subsidiary question that is fairly included.[34] Anderson's appellate briefing incorporated the fraudulent-inducement issue in the following issue statement:

> There is legally and factually sufficient evidence to support the jury's finding that [Durant and Auto Group] committed fraud. The evidence shows that Durant promised to provide [Anderson] a 10% ownership interest in both the Durant Toyota and Durant Hyundai dealerships in Granbury, Texas with no intention of keeping that promise at the time it was made.

Under a liberal, yet reasonable construction, this statement encompasses the argument that Auto Group fraudulently induced Anderson to enter an agreement by making a promise of future performance with the present intent not to perform.

In sum, we hold that the jury findings are sufficient to support a finding of fraudulent inducement because the fraud submissions incorporate the necessary elements for recovery, including an enforceable promise, the existence of which is supported by legally sufficient evidence.

---

[33] *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 221-22 (Tex. 2017) (citation and internal quotation marks omitted).

[34] TEX. R. APP. P. 38.1(f).

### III. Defamation Damages

Actionable defamation requires (1) publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) that proximately caused damages.[35] Proximate cause encompasses both foreseeability and cause in fact.[36] A defendant's action is the cause in fact of damages "if it was a substantial factor in causing the injury and without which the injury would not have occurred."[37]

Defamation per se refers to false statements so obviously harmful that general damages may be presumed.[38] General damages include non-economic losses, such as mental anguish and loss of reputation.[39] When harm is presumed, a nominal sum may be awarded without proof of damages, but amounts exceeding nominal damages require evidentiary support.[40] Special damages, which represent specific economic losses, are never presumed and must always be proven.[41]

The Respondents dispute whether the defamatory statements here constitute defamation per se, but the appellate court did not rule on that issue. In any event, the jury awarded both special damages and general damages that exceed nominal damages—neither of which are ever presumed.

---

[35] *Bos v. Smith*, No. 16-0341, 2018 WL 2749714, at *10 (Tex. June 8, 2018).

[36] *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010).

[37] *Bos*, 2018 WL 2749714, at *11 (citation and internal quotation marks omitted).

[38] *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015).

[39] *Id*.

[40] *Id.*

[41] *Id.*

Accordingly, whether the case involves defamation per se or not, Anderson cannot recover the damages awarded for defamation unless the awards are supported by the evidence.[42]

### A. General Damages

Non-economic damages offer a pecuniary remedy for non-pecuniary harm[43] and are not amenable to calculation with "precise mathematical precision."[44] The jury, therefore, has latitude in determining the award, though we do not grant "carte blanch" in deciding the matter.[45] Rather, the jury must award "an amount that a reasonable person could possibly estimate as fair compensation."[46]

### 1. Mental Anguish

The jury awarded Anderson $400,000 for past mental anguish and $400,000 for future mental anguish, but the court of appeals found no evidence to support an award of any mental-anguish damages, past or future.[47] We disagree, in part. Some evidence supports the award of past mental-anguish damages, but no evidence supports an award of damages for future mental anguish.

A damages award for mental anguish will survive a legal-sufficiency challenge when the record bears "direct evidence of the nature, duration, and severity of [the plaintiff's] mental anguish,

---

[42] *Id.*

[43] *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 153 (Tex. 2014).

[44] *Brady v. Klentzman*, 515 S.W.3d 878, 887 (Tex. 2017).

[45] *Bentley v. Bunton*, 94 S.W.3d 561, 605 (Tex. 2002).

[46] *Waste Mgmt.*, 434 S.W.3d at 153 (citation and internal quotation marks omitted).

[47] 2016 WL 552034, at *6-7 (Tex. App.—Fort Worth 2016).

thus establishing a substantial disruption in the plaintiff['s] daily routine," or when the record demonstrates "evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger."[48] Such evidence is more likely to provide the fact finder with adequate details about the extent of the claimant's mental anguish.[49] To recover damages for future mental anguish, the plaintiff must further demonstrate a reasonable probability that compensable mental anguish will persist.[50] "[G]eneralized, conclusory descriptions of how an event affected a person are insufficient evidence on which to base mental anguish damages."[51]

Individuals experience mental anguish in myriad ways, so each case is unique. Nevertheless, reasonable guideposts appear in our jurisprudence and instruct our analysis. For example, in *Bentley v. Bunton*, we found evidence that compensable mental anguish resulted from defamatory statements that the plaintiff, a judge, was corrupt, but no evidence supporting the jury's multi-million-dollar award.[52] The plaintiff testified he lost time with his friends and family, spent time worrying at home, and was distressed about the impact the defamatory statements had on him and his family within their community.[53] The plaintiff's wife corroborated his testimony, testifying he lost sleep, suffered from stress, and would never be the same.[54] Similarly, a friend testified the plaintiff's demeanor had

---

[48] *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995) (citation and internal quotation marks omitted).

[49] *Id.*

[50] *Adams v. YMCA of San Antonio*, 265 S.W.3d 915, 917 (Tex. 2008).

[51] *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 232 (Tex. 2011).

[52] 94 S.W.3d 561, 606-07 (Tex. 2002).

[53] *Id.* at 576.

[54] *Id.*

20

changed and he had behaved "downcast," "depressed," and "sad."[55]  We held this to be legally sufficient evidence of mental anguish.[56]  We remanded the case to the court of appeals with instructions to "reconsider the excessiveness of the jury's award of mental anguish damages" and to either order a retrial or suggest a remittitur.[57]  In a subsequent appeal, we upheld the court of appeals' suggested remittitur that left $150,000 in mental-anguish damages on the table.[58]

Although corroborating evidence was helpful in *Bentley*, we do not require it when the plaintiff's testimony provides sufficient evidence of mental anguish.[59]  In *Service Corp. International v. Guerra*, we found evidence supported an award of mental-anguish damages to a widow after her husband's grave had been defiled.[60]  The widow testified she was anxious for years about whether her own grave would be desecrated, was afflicted with headaches, could not sleep, and suffered stress that caused burning in her stomach.[61]  She sought medical treatment for these issues and was prescribed medication for anxiety and depression.[62]  This testimony was legally sufficient evidence of compensable mental anguish, despite the widow's ability to continue

---

[55] *Id.*

[56] *Id.* at 604.

[57] *Id.* at 607.

[58] *Bunton v. Bentley*, 153 S.W.3d 50, 52-53 (Tex. 2004).

[59] *See Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995) (stopping short of requiring direct evidence of mental anguish, but noting "the absence of this type of evidence, particularly when it can be readily supplied or procured by the plaintiff, justifies close judicial scrutiny of other evidence offered on this element of damages").

[60] 348 S.W.3d 221, 233 (Tex. 2011).

[61] *Id.*

[62] *Id.*

volunteering, participating in church activities, and traveling.[63] We did not consider whether remand was necessary to determine excessiveness because we ordered a new trial on other grounds.[64]

Here, Anderson testified about the degree, duration, and nature of his distress:

> The accusations that were made have affected me. They basically destroyed me. You get up every morning -- I've never understood depression. My wife and daughter always called me Mr. Happy, Mr. Sunshine, and I was -- they wouldn't berate me. They all thought that it was a joke. But since these accusations have come about, I'm paranoid about going outside. Have trouble focusing. Anxiety, anxious. It's been a two-year nightmare trying to get my life back and my reputation back and it's -- it's been a two-year nightmare, like I say.
>
> . . . .
>
> I had trouble sleeping. I had trouble eating. I had trouble focusing on things. I worried about my family's future. Worried about my 30-year career that had been slandered all over town.

Anderson also testified that he sought medical help from a psychiatrist and was prescribed anti-anxiety medication.

Anderson's testimony reflects a substantial disruption in his life. His familial relationships were impacted; his demeanor changed; he was unable to sleep; and he was treated for anxiety and depression. Although no other witness corroborated Anderson's account, his testimony is evidence of a high degree of mental pain to the point that his wife and daughter noticed an alteration in his demeanor and treated him differently in response. Anderson's testimony is some evidence he suffered compensable mental anguish.

---

[63] *Id.*

[64] *Id.*

The jury's $400,000 award appears to be excessive compared to awards in cases involving similar or more egregious behavior,[65] but excessiveness of a damages award is a factual-sufficiency inquiry committed to the court of appeals' exclusive jurisdiction.[66] The court of appeals did not rule on the Respondents' factual-sufficiency complaints, having concluded no evidence supported any award of defamation damages. The court may do so on remand and, depending on the outcome of that review, may suggest a remittitur or remand for a new trial.[67]

The jury's award of future mental-anguish damages is not sustainable because the record does not include evidence substantiating a reasonable probability that Anderson will continue to suffer mental anguish. We therefore affirm the appellate court's judgment reversing this award.[68]

---

[65] *See, e.g.*, *Champion Printing & Copying LLC v. Nichols*, No. 03-15-00704-CV, 2017 WL 3585213, at *4-5 (Tex. App.—Austin Aug. 18, 2017, pet. denied) (mem. op.) (finding legally sufficient evidence supported award for $20,000 past mental anguish and $10,000 future mental-anguish damages in a suit involving a wedding photographer who allegedly defamed and interfered with the business of another wedding photographer); *Miranda v. Byles*, 390 S.W.3d 543, 554-57 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (sustaining $25,000 mental-anguish damages award where defendant defamed plaintiff by accusing him of sexually abusing her grandchild); *Beaumont v. Basham*, 205 S.W.3d 608, 618 (Tex. App.—Waco 2006, pet. denied) (finding factually sufficient evidence to support mental-anguish damages awards of $35,000 for theft and $50,000 for invasion of privacy where defendants broke into their former employee's house and publicly accused him of embezzlement and having sex with a minor).

[66] *See In re S.M.R.*, 434 S.W.3d 576, 586 (Tex. 2014) ("[T]his Court itself lacks jurisdiction to determine questions of factual sufficiency . . . ."); *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998) ("The standard of review for an excessive damages complaint is factual sufficiency of the evidence.").

[67] *Bentley v. Bunton*, 94 S.W.3d 561, 607-08 (Tex. 2002); *see also ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 880 (Tex. 2010).

[68] *See Adams v. YMCA of San Antonio*, 265 S.W.3d 915, 917 (Tex. 2008) (setting the standard for recovering damages for future mental anguish).

## 2. Reputation Damages

The jury awarded $400,000 for past reputation damages and $400,000 for future reputation damages. The court of appeals reversed, holding no more than a scintilla of evidence existed that Anderson's reputation was actually damaged, in the past or future, or had been damaged in the amount awarded.[69] We hold the record bears legally sufficient evidence that Anderson's reputation was harmed in the past, but no evidence that future impairment is reasonably probable.

Reputation damages are recoverable but not susceptible to precise calculation.[70] Nevertheless, "evidence of loss of reputation should be more than theoretical."[71] Rumors within a community are not enough; instead, the evidence must show "that people believed the statements and the plaintiff's reputation was actually affected."[72] Evidence that the plaintiff has lost a job or business opportunities may be evidence of loss of reputation, but only if it is connected to the defamatory statements.[73] Once a loss has been shown, the jury has discretion to estimate the amount that will reasonably compensate the plaintiff.[74] Evidence assigning an actual dollar value to the injury is not required;[75] rather, reasonable compensation is the touchstone for quantifying damages.[76]

---

[69] 2016 WL 552034, at *4-6 (Tex. App.—Fort Worth 2016).

[70] *Brady v. Klentzman*, 515 S.W.3d 878, 887 (Tex. 2017).

[71] *Id.*

[72] *Id.*

[73] *Id.*

[74] *See Bentley v. Bunton*, 94 S.W.3d 561, 605 (Tex. 2002).

[75] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 350 (1974).

[76] *See Bentley*, 94 S.W.3d at 605-06.

We have found evidence of an actual injury to reputation when the plaintiff presents direct evidence that people within the community had changed their opinion of him.[77] In *Brady v. Klentzman*, we held the record bore evidence that a defamatory article portraying the plaintiff as "unruly and intoxicated" and benefitting from his father's position as sheriff actually damaged the plaintiff's reputation.[78] One witness described the plaintiff as having a reputation for being a "good kid" before the article was published.[79] The plaintiff's father testified that after the article, he met "people in the community that had a negative impression" of him.[80] That some people thought less of the plaintiff after the article was published was direct proof of injury to the plaintiff's reputation.[81]

Losing a job or business opportunity due to defamation can support recovery of reputation damages.[82] In *Brady*, the plaintiff's employer voiced concerns to him about the defamatory article, and shortly after, the plaintiff was asked to quit his job.[83] The plaintiff's employer specifically expressed concern about the article, and the temporal proximity between that expression and the plaintiff's termination suggested a relationship to the defamatory statements.[84] The fact that the plaintiff later resumed work at the same business did not negate the evidence that his reputation had

---

[77] *See Brady*, 515 S.W.3d at 887.

[78] *Id.* at 881, 888.

[79] *Id.* at 887.

[80] *Id.*

[81] *See id.*

[82] *See id.*

[83] *Id.*

[84] *See id.*

been harmed.[85]  Based on direct evidence about the community's altered opinion, we concluded some evidence supported a $30,000 reputation-damages award.[86]

But an award of damages cannot be based on mere speculation that the plaintiff's reputation suffered.[87]  In *Burbage v. Burbage*, we found no evidence supported the jury's award of $3.8 million in reputation damages.[88]  The evidence, we said, suggested that the community was aware of the defamatory statements, but the plaintiff failed to produce evidence that his reputation was actually impaired.[89]  He testified he did not know if he still had a good reputation within the community, but he hoped at least some people would not believe the rumors.[90]  His mother testified that some people would probably believe the rumors, but "most people would not believe [them]."[91]  Because the evidence failed to show any actual damage or that anyone believed the rumors, the proffered evidence did not support the existence of reputational injury.[92]

Here, Anderson relies on testimony from a prospective employer, Jason Hiley, that he would not hire Anderson due to the illegal-kickback allegations.  Hiley testified that before hearing about Anderson's alleged malfeasance, he believed Anderson "was a really good guy and had a really

---

[85] *Id.*

[86] *See id.*

[87] *Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014).

[88] *Id*. at 262-63.

[89] *Id.* at 262.

[90] *Id.*

[91] *Id.*

[92] *Id.*

26

good reputation." On the issue of whether Anderson's reputation changed as a result of the kickback rumors, Hiley testified:

> I mean, other than a -- other than the rumor that's out there, you know. You know, obviously . . . that would weigh on my mind a little bit. But, no, I think he's -- I think he's a good guy.

But when asked why he did not hire Anderson, Hiley testified that it was, in part, due to the rumors:

> Well, obviously, I mean I heard some -- heard some rumors after the fact . . . . But there was about a two-week period where we didn't visit at all. And, you know, I had heard that there were some -- there was more to the reason that they didn't -- that they parted company and so I just didn't take it any further. I had already been talking to [another job candidate] as well and we were already pretty far down the road.

Hiley also said he would only consider interviewing and hiring Anderson for a future position if he "knew what the outcome of the rumors were."

This testimony constitutes more than a scintilla of evidence that the kickback allegations damaged Anderson's reputation. Hiley's opinion of Anderson changed to the point that he would not consider Anderson for any position unless his name were cleared. This evidence is not merely hypothetical or speculative, but directly reflects Hiley's opinion about Anderson's character. We do not require conclusive proof that Anderson would have been hired but for the defamatory statements but rather a reasonable inference that Anderson's reputation changed for the worse. This evidence is enough to cross the legal-sufficiency threshold regarding the existence of reputation damages.

For these reasons, we disagree with the court of appeals' holding that the evidence is legally insufficient to support the jury's award of reputation damages. But, as with mental anguish, the

27

damages award is substantially higher than amounts awarded in equally or more egregious cases.[93] The court of appeals did not reach the factual-sufficiency challenges the Respondents raised, but may do so on remand.[94]

As to future damages for loss of reputation, we affirm the appellate court's take-nothing judgment.[95] No evidence, direct or otherwise, support's the jury's finding that Anderson's reputation will, in reasonable probability, remain tarnished, and thus, no evidence to support an award for future damages.[96]

## B. Special Damages

The jury awarded Anderson $269,000 for past lost income and $360,000 for future lost income, based on a comparison between Anderson's potential earnings had he continued his employment at Auto Group and Anderson's actual earnings and current salary. The court of appeals

[93] *See, e.g.*, *Brady v. Klentzman*, 515 S.W.3d 878, 881, 886-88 (Tex. 2017) (sustaining $30,000 award for reputational injury where sheriff's son was portrayed as "unruly and intoxicated" and benefitting from his father's position); *Cullum v. White*, 399 S.W.3d 173, 182-86 (Tex. App.—San Antonio 2011, pet. denied) (finding legally sufficient evidence supporting $50,000 award for past reputational injury where ranch owner sued former employee for libel after he alleged ranch was involved in various crimes).

[94] *Bentley v. Bunton*, 94 S.W.3d 561, 607-08 (Tex. 2002); *see also ERI Consulting Eng'rs, Inc. v. Swinnea*, 318 S.W.3d 867, 880 (Tex. 2010).

[95] The court of appeals also held that Anderson's reputation damages failed because no evidence showed the defendants were the source of the rumors that he was fired for taking kickbacks. 2016 WL 552034, at *5 (Tex. App.—Fort Worth 2016). We do not reach this issue. The Respondents raised issues the court of appeals did not address regarding the propriety of the defamation charge and, in particular, how it failed to require the jury to find they each made specific defamatory statements. This potential charge error would be legally irrelevant if the record contained no evidence of the existence and amount of Anderson's reputation injuries, but we have concluded otherwise. On remand, the appellate court should consider the Respondents' charge-error issues before determining whether the evidence regarding the source of particular rumors is deficient, assuming such evidence is required, which we do not determine.

[96] *See* RESTATEMENT (SECOND) TORTS § 910 & cmt. a (1979) (one injured by another's tort may recover damages for prospective harm "if the risk of the future harm is substantial and proof of the probable extent satisfies the rules as to certainty"); *see* RESTATEMENT (THIRD) TORTS: LIABILITY FOR PHYSICAL AND EMOTIONAL HARM, introduction ("[T]his Restatement does not address protection of reputation . . . . Those matters remain governed by the Second Restatement of Torts . . . .").

held Anderson cannot recover lost-income damages because he "failed to link the acts of the defendants to any loss of his income."[97] We agree that the evidence of proximate causation is legally insufficient.

As an at-will employee, either Anderson or Durant could terminate the employment relationship at any time for good, bad, or no cause at all.[98] Consequently, Anderson cannot recover lost income caused solely by the termination of his employment, as that would essentially allow damages against an employer for terminating an at-will employee.[99] Rather, Anderson must show that the defamation, not his termination, proximately caused his lost income. We agree with the court of appeals that the record bears no evidence of this connection.

Hiley testified that he discontinued the interview process with Anderson after he heard the kickback rumors, but he also said he chose another candidate who had already been the frontrunner for the position. Thus, Hiley not pursuing Anderson's application in favor of an established candidate is no more than a scintilla of evidence that Anderson's inability to find a new job for ten months or a comparable job in the time after was based on the defamatory kickback allegations. As such, evidence of proximate cause—some proof that without the defamation, Hiley or anyone else would have hired Anderson sooner or for higher compensation—is lacking.[100]

---

[97] 2016 WL 552034, at *8.

[98] *Cty. of Dallas v. Wiland*, 216 S.W.3d 344, 347 (Tex. 2007).

[99] *Exxon Mobil Corp. v. Hines*, 252 S.W.3d 496, 503 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) ("[A]n employee cannot recover as defamation damages those damages *caused by employment termination*." (emphasis in original)).

[100] *See Bos v. Smith*, No. 16-0341, 2018 WL 2749714, at *11 (Tex. June 8, 2018).

## IV. Remaining Issues

The only issues before this Court are (1) whether the jury's failure to find the parties agreed to the specific contract terms submitted in the contract question precludes Anderson from recovering benefit-of-the-bargain damages on his fraudulent-inducement claim and (2) whether legally sufficient evidence supports the awards of reputation, mental-anguish, and lost-income damages. In the court below, the Respondents raised other issues the appellate court did not reach.[101] Consistent with our discretion to do so, we remand to the court of appeals to consider the unaddressed issues.[102] We express no intent to limit the scope of remand except as to the issues decided in this opinion.

## V. Conclusion

We hold that the fraudulent-inducement questions incorporated the elements of an enforceable contract, no findings contradicted or negated the existence of an enforceable promise, and Anderson may therefore recover benefit-of-the-bargain damages on his fraudulent-inducement claim. We further hold that Anderson adduced legally sufficient evidence that he suffered reputational harm and mental anguish, but insufficient evidence that he will, in reasonable probability, continue to suffer in the future or that he suffered lost-income due to the defamatory statements. We remand the case to the court of appeals for further proceedings consistent with this opinion.

---

[101] The unaddressed issues include sufficiency of the evidence to support the jury's findings of a material misrepresentation and detrimental reliance on the fraudulent-inducement claim; whether the defamatory statements constituted defamation per se, consisted of verifiable facts as opposed to opinions, or were made with actual malice or pursuant to legal privilege; excessiveness of the surviving damages awards; and alleged jury charge error.

[102] *See Stanglin v. Keda Dev. Corp.*, 713 S.W.2d 94, 95 (Tex. 1986) (op. on reh'g).

_____
Eva M. Guzman
Justice

**OPINION DELIVERED**: June 22, 2018

31