**Affirmed in Part, Reversed in Part, and Remanded; Remittitur Suggested; and Majority Opinion in Part, Memorandum Majority Opinion in Part, and Concurring and Dissenting Opinion filed October 28, 2021.**



**In The**

# Fourteenth Court of Appeals

---

### NO. 14-19-00750-CV

---

## NATIONSTAR MORTGAGE LLC; HSBC BANK USA, N.A; BANK OF AMERICA, N.A; AND FIDELITY NATIONAL TITLE INSURANCE COMPANY, Appellants

### V.

## JOAN MAURI BAREFOOT, Appellee

---

**On Appeal from the 295th District Court
Harris County, Texas
Trial Court Cause No. 2014-39628**

---

## C O N C U R R I N G   A N D   D I S S E N T I N G   O P I N I O N

I respectfully concur in the majority's opinion in part and dissent in part.

I concur with the majority in overruling Fidelity's first issue, but I write separately based on my disagreement with the majority's analysis of Fidelity's

intent to cause financial injury and analysis of loss-of-market value damages. I dissent to the majority's opinion reversing Barefoot's mental-anguish damages from Fidelity ($225,000) and HSBC ($100,000), and I would affirm the judgment of the trial court as to these damages for the reasons discussed below.

**Fidelity's Appeal - Issue One**

*A. Fidelity's Intent to Cause Financial Injury*

I agree with the majority's conclusion overruling Fidelity's first issue; however, I disagree with the majority's analysis.

In enacting § 12.002, "the Legislature intended to provide a civil action for injunctive relief and monetary damages to all persons owning an interest in real or personal property against which a fraudulent lien is filed." *Centurion Planning Corp., Inc. v. Seabrook Venture II,* 176 S.W.3d 498, 505 (Tex. App.—Houston [1st Dist.] 2004, no pet.). Consistent with this purpose, § 12.002(a)(3) requires "intent" to cause "another person" to suffer, *inter alia,* "physical injury," "financial injury," or "mental anguish or emotional distress." Tex. Civ. Prac. & Rem. Code Ann. § 12.002(a)(3).

Fidelity closed two home-equity loan transactions, referred to as the 2005 and 2007 Instruments, knowing that title to the property did not belong solely to Barefoot. Fidelity did not share this information with Barefoot. Fidelity recorded both the 2005 and the 2007 Instruments with the Harris County Clerk. As part of the closing on the 2005 transaction, Fidelity issued a title commitment that stated that title to the property appeared to be vested in both Barefoot and Robert, but did not share this document with Barefoot, and as part of the closing on the 2007 Instrument, Fidelity issued, but did not share with Barefoot, a title commitment policy stating that title to the property was vested in Barefoot, Robert, and Joan. In

2

closing the 2005 and 2007 transactions, Fidelity did not disclose to Barefoot any information indicating that she was not the sole owner of the property. All of the documents Fidelity provided to Barefoot at the closings indicated that she was the sole owner of the property.

Despite these facts, the majority concludes:

> While Barefoot was assessed these charges, Fidelity's actions also enabled Barefoot to procure the loans in question, which presumably she would not have sought were they against her financial interest. Under these circumstances, the mere fact that Fidelity charged premiums and costs does not permit an inference that, in so doing, it intended to cause Barefoot financial harm by preparing and filing fraudulent liens in conjunction with the 2005 and 2007 transactions. *See Suarez v. City of Tex. City*, 465 S.W.3d 623, 634 (Tex. 2015) (inference is not reasonable if evidence is susceptible to multiple, equally probable inferences, requiring factfinder to guess to reach conclusion).

The term "intent" generally means that "the actor desires to cause the consequences of his act or that he believes the consequences are substantially certain to result from his act." *Crosstex N. Tex. Pipeline, L.P. v. Gardiner*, 505 S.W.3d 580, 605 (Tex. 2016).

The "intent" element of § 12.002 requires only that the person filing the fraudulent lien be aware of the harmful effect that filing such a lien could have on a landowner. *See Taylor Elec. Servs., Inc. v. Armstrong Elec. Supply Co.,* 167 S.W.3d 522, 531–32 (Tex. App.—Ft. Worth 2005, no pet.); *see also Barron v. Al Shmainsani*, No. 02-19-00064-CV, 2021 WL 2253301, at *16–18 (Tex. App.—Fort Worth June 3, 2021, pet. filed) (mem. op.); *Vanderbilt Mortg. & Fin., Inc. v. Flores*, 735 F. Supp. 2d 679, 689 (S.D. Tex. 2010) (order). Whether Fidelity's actions enabled Barefoot to procure the loans is not the question; the issue is whether Fidelity, a title company, was aware of the harmful effect the fraudulent liens would have on Barefoot. Fidelity knew that the liens it filed in the Harris

3

County Clerk's records were void, and Fidelity knew that the filing of the liens could prevent both the sale of the property and the transfer of good title to the property. This could constitute a financial injury to Barefoot. *See* Tex. Civ. Prac. & Rem. Code Ann. § 12.002(a)(3)(B). Because Fidelity was aware of the harmful effect that the filing of the invalid liens could have on Barefoot, the trial court could have inferred that Fidelity intended to cause Barefoot financial injury when it filed fraudulent liens with the Harris County Clerk. *See id.*; *Crosstex N. Tex. Pipeline*, 505 S.W.3d at 605; *Taylor Elec. Servs.*, 167 S.W.3d at 531–32; *see also Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986) ("Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony.").

### B. Loss-of-market-value damages

The majority reaches the correct conclusion in reversing Barefoot's recovery for loss-of-market damages from Fidelity; however Barefoot cannot recover loss-of-market-value damages for a reason other than that stated by the majority: foreseeability.

Section 12.002 provides that a person who violates the statute is liable to each injured person for the actual damages caused by the violation. Tex. Civ. Prac. & Rem. Code Ann. § 12.002(b)(1)(B). Actual or compensatory damages are intended to compensate a plaintiff for the injury she incurred and include general damages (which are non-economic damages such as loss of reputation or mental anguish) and special damages (which are economic damages such as lost income). *Hancock v. Variyam*, 400 S.W.3d 59, 65 (Tex. 2013); *see* Tex. Prac. & Rem. Code Ann. § 41.001(4), (8).

Although it is foreseeable that Barefoot would suffer loss of value of the property due to the actions or inactions of Fidelity, it was not foreseeable that

4

Barefoot would suffer flood damage to the property due to the City of Houston reconnecting water service to the property, which flooded because of an undetected leaking uncapped refrigerator line. *See Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 816 (Tex. 1997); *see also Fazio v. Cypress/GR Hous. I, L.P.*, 403 S.W.3d 390, 395 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) ("Consequential damages must be foreseeable and directly traceable to the misrepresentation and result from it."); *Language People, Inc. v. Barish*, No. 03-18-00538-CV, 2019 WL 5057659, at *7 (Tex. App.—Austin Oct. 9, 2019, no pet.) (mem. op.) ("Special damages are those foreseeable damages that are the natural result of the defendant's wrongful acts.").

**Fidelity's Issue Three** - **Mental Anguish Damages**

The majority concludes that the record does not support Barefoot's award of mental anguish damages against Fidelity. In so doing, the majority concludes that Barefoot did not specifically produce any evidence of mental anguish she suffered as a result of Fidelity's actions in 2014 or later, which is when the Fidelity was involved in the lawsuit against Barefoot. I disagree that the filing of the lawsuit is the only conduct for which Fidelity was properly held liable. As noted above, Fidelity was also properly held liable for the filing of the fraudulent liens with the Harris County Clerk in 2005 and 2007. Thus, the majority errs in disregarding the testimony and evidence of mental anguish damages preceding the filing of the lawsuit in 2014; the question then becomes whether there was sufficient evidence supporting the award of mental anguish damages.

A damages award for mental anguish will survive a legal-sufficiency challenge when the record bears direct evidence of the nature, duration, and severity of the plaintiff's mental anguish, thus establishing a substantial disruption in the plaintiff's daily routine, or when the record demonstrates evidence of a high

degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger. *Anderson v. Durant*, 550 S.W.3d 605, 618–19 (Tex. 2018). Mental anguish is a "relatively high degree of mental pain and distress that is more than mere disappointment, anger, resentment or embarrassment, although it may include all of these." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). There must be both evidence of the existence of compensable mental anguish and evidence to justify the amount awarded." *Hancock*, 400 S.W.3d at 68. Mental anguish is only compensable if it causes a "substantial disruption in . . . daily routine" or "a high degree of mental pain and distress." *Parkway*, 901 S.W.2d at 444. "Even when an occurrence is of the type for which mental anguish damages are recoverable, evidence of the nature, duration, and severity of the mental anguish is required." *Serv. Corp. Intern. v. Guerra*, 348 S.W.3d 221, 231 (Tex. 2011). "Generalized, conclusory descriptions of how an event affected a person are insufficient evidence on which to base mental anguish damages." *Anderson*, 550 S.W.3d at 619.

The record reveals that Barefoot endured a high degree of mental pain and distress that was more than mere worry, anxiety, vexation, embarrassment, or anger. *See Parkway*, 901 S.W.2d at 444. Here, Barefoot testified that when she was first informed of the prospect that the property could be foreclosed on, "my reaction was that—that's when everything became even—it was panic." Barefoot explained that she was "very upset about losing my life's work and my home, which was like my sanctuary, and . . . the history with myself and my daughter, my family, my friends." Barefoot also testified that, after she was informed by Stewart Title that she was not the sole owner of the home, she called Fidelity, and she ended the call with a Fidelity escrow officer "so upset that it was like, okay, I just have to go higher up." Barefoot explained that resolving this "horrible mess" "had become a full-time job" when she spoke with Warren Miller, a vice-president for

Fidelity. According to Barefoot, Miller was initially very patient and told her that Fidelity would fix the issue, "even if it means paying off the loan"; however, Miller's position on the matter later changed and he told Barefoot to "sue Fidelity." Barefoot explained that she was "shocked" and "now my head was just spinning every just way you could imagine."

Additionally, after receiving an email from Fidelity in 2012 with a title commitment showing she did not own the home, Barefoot was "enraged." Barefoot testified that she felt "hopeless" regarding her ability to complete the short sale of the property. Barefoot was "completely devastated" after receiving a letter from Bank of America "completely disregarding everything I had been talking about for months now." Barefoot explained she "was really very embarrassed and humiliated" that her neighbors saw "Vacancy" and "For Sale" notices on her home, and she "was furious about the this [sic] house is for sale and it wasn't for sale." Barefoot explained that trying to sell the house "was literally a nightmare" and that "I felt like I was pulling my hair out and I was going crazy, literally." Barefoot stated she felt "absolute exhaustion" and did not "feel physically well." Barefoot felt "for the first time in my life . . . like I just can't trust anyone . . . and something changed during that time . . . something inside of me, yeah." Finally, Barefoot also testified that, when she saw the water damage to her house in 2012, which the trial court attributed to Fidelity in awarding actual damages, she felt "[l]ike just I can't take another thing" and "overwhelmed."

Barefoot's distress during her attempts to sell the house, which preceded the filing of the 2014 lawsuit, resulted from her erroneous belief that there was a valid security interest on her property that could be foreclosed on to collect on the loan.

There is sufficient evidence that Fidelity's actions in filing the fraudulent liens in 2005 and 2007 created a substantial disruption of Barefoot's daily routine

and a high degree of mental distress. *See Anderson*, 550 S.W.3d at 618–19. The majority errs in reversing the trial court's award to Barefoot of mental-anguish damages as to Fidelity and suggesting a remittitur. The judgment of the trial court as to Barefoot's mental anguish damages as to Fidelity should be affirmed.

**Bank of America's Appeal – Issue B**

The majority concludes there is legally insufficient evidence that Bank of America violated § 12.002 regarding fraudulent liens. However, Bank of America knew that the liens filed on the property were fraudulent because (1) it knew that Barefoot was not the sole owner, and (2) it knew that Fidelity filed the lien despite Fidelity's knowledge that Barefoot was not the sole owner of the home. Thus, Bank of America knew that the liens were created with dishonesty or a lack of integrity. *See* Tex. Civ. Prac. & Rem. Code Ann. § 12.002(a)(1).

Barefoot testified to an email admitted into evidence that she sent to Bank of America on May 22, 2012, informing Bank of America that she had acquired paperwork showing that the 2007 Instrument " was fraud"; that Fidelity admitted she was not the sole owner; and that Fidelity admitted the loan should have never been funded. Nevertheless, Bank of America and HSBC initiated a foreclosure action based on the void and fraudulent lien in November of 2012. This is legally sufficient evidence that Bank of America violated § 12.002. The question then becomes whether the record demonstrates there was sufficient evidence supporting the trial court's award to Barefoot of $75,000 in mental anguish damages as to Bank of America. I agree with the majority's analysis and conclusion that Barefoot presented sufficient evidence of mental anguish as to Bank of America, and I would remand the attorney fee award for reconsideration of attorney's fees.

**HSBC's Appeal - Issue Five**

The majority concludes that the evidence is legally insufficient to support a

8

judgment against HSBC for violations of Civil Practice and Remedies Code § 12.002. In doing so, the majority concludes that there is legally insufficient evidence that "they knew the liens were fraudulent." The trial court made the following findings of fact relevant to HSBC:

48. Following the Court denial of the TRCP 736 application, Hayden Hooper, an attorney with Barrett Daffin—counsel for HSBC, BoA, and Nationstar—*admitted in written correspondence that the Property could not be foreclosed* on because there was no conveyance of record of Robert's interest in the Property to Barefoot.

. . .

52. During the pendency of this lawsuit, *Defendants have presented the 2007 Instrument with knowledge that it is a fraudulent lien*, intending it to be given legal effect, with the intent for the Property to be foreclosed.

(emphasis added).

I disagree with the majority's conclusion that there is legally insufficient evidence as to HSBC. HSBC was the owner and holder of both the 2005 and 2007 instruments. The record establishes that HSBC knew that the liens created by the instruments were void and fraudulent at the time it filed suit to foreclose on the home and enforce the fraudulent lien in 2012. Furthermore, our record shows a January 16, 2013, letter admitted into evidence from Barefoot's counsel informing HSBC's counsel, Barrett Daffin Frappier Turner & Engel, LLP, of the fraudulent nature of the liens. Nevertheless, HSBC filed the underlying suit for declaratory judgment seeking a declaration that an instrument it knew was void was a valid and enforceable lien. Thus, there is legally sufficient evidence that HSBC violated § 12.002. Finally, for the same reasons noted above detailing Barefoot's mental anguish as to Fidelity, there is legally sufficient evidence that Barefoot suffered mental anguish from HSBC's violation of § 12.002. Barefoot testified to a

9

continuous course of conduct by Fidelity, Bank of America, and HSBC: Fidelity, which provided attorneys to HSBC to seek enforcement of the liens; Bank of America, with whom Barefoot communicated by telephone, email, and letter, and in person, informing BOA of the issues with the loan, and providing to the BOA representatives the Stewart Title and Fidelity 2012 title commitments showing she did not own the home, after which BOA attempted to foreclose on the home; and HSBC, the entity that continued to attempt to enforce the fraudulent lien knowing the lien to be fraudulent. This Court should affirm the trial court's finding that HSBC violated § 12.002 and uphold the award of mental anguish assessed against it.

/s/    Margaret "Meg" Poissant
       Justice

Panel consists of Justices Spain, Hassan, and Poissant. (Spain, J., majority).