**Opinion issued August 15, 2019**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-17-00632-CV

————————————

**MEMORIAL HERMANN HEALTH SYSTEM, Appellant**

**V.**

**MIGUEL A. GOMEZ, III, M.D., AND MIGUEL A. GOMEZ, M.D., P.A.,
Appellees**

---

**On Appeal from the 333rd District Court
Harris County, Texas
Trial Court Case No. 2012-53962**

---

## O P I N I O N

Appellees, Miguel A. Gomez, III, M.D., and Miguel A. Gomez, M.D., P.A.

(Gomez P.A., or, collectively, Gomez), sued appellant, Memorial Hermann Health

System (MHHS), for defamation, business disparagement, tortious interference

with prospective business relations, and restraint of trade based on two main

allegations—that MHHS had used misleading data and a "whisper campaign" to eliminate competition by defaming Gomez and disparaging Gomez P.A. Following a lengthy trial, the jury found in favor of Gomez and Gomez P.A. on their defamation and business disparagement claims and awarded them more than $6 million in compensatory and exemplary damages.

In six issues on appeal, MHHS argues that: (1) the alleged defamation and disparagement described in the jury charge through Gomez's testimony regarding a conversation he had with an MHHS administrator was not published to a third party; (2) there was no evidence that the defamation and disparagement described in the jury charge as a statement made by an MHHS physician liaison to an employee of a competitor hospital caused any of Gomez's alleged damages; (3) the alleged defamatory and disparaging statements were protected by qualified privilege; (4) there is no evidence of causation generally; (5) there is legally insufficient evidence of lost profits; and (6) alternatively, the judgment should be reformed to eliminate a purportedly improper "double recovery" and the award for exemplary damages.

In a contingent cross appeal, Gomez and Gomez P.A. argue that trial court erred in its submission of their claim for tortious interference with prospective business relations to the jury.

We affirm.

**Background**

**A.      Prior to 2008, Gomez Practiced Exclusively with MHHS**

Gomez practiced as a cardiovascular surgeon for MHHS at its Memorial Hermann/Memorial City location (MH/MC) beginning in 1998.  He testified that Dr. Don Gibson, "the primary heart surgeon there," was looking for another surgeon to join his group.  Over the next ten years, their practice continued to be successful.

Dr. Phillip Berman, a friend and cardiologist who had referred patients to Gomez, testified that, leading up to 2009, he and other cardiologists "thought [Gomez] was an excellent surgeon" because "[h]e was successful. He was doing quite well. He did the robotic surgery. Patients did well."

**B.      Late 2008 Through Early 2009, Gomez's Practice Experienced Changes**

However, in 2008, the West Houston-medical market had begun to change in several material ways. MH/MC became concerned regarding mortality rates in its cardiovascular surgery department.[1]

In 2008, Methodist Hospital System moved forward with plans to open a new hospital in West Houston, Methodist West Hospital.

---

[1]      Records showed that from 2005–2008, Gomez had fourteen mortalities and the three other cardiovascular surgeons at that hospital had mortalities ranging from zero to eleven each. However, the record indicates that this data was not formally compiled by MH/MC or MHHS until the fall of 2009.

Also in 2008, the then-CEO of MH/MC, Wayne Voss, left and ultimately went to work with Methodist and became the CEO of Methodist West Hospital. Throughout late 2008 and early 2009, Methodist West recruited other employees from MH/MC as well. After Voss left, MHHS made changes at MH/MC, including hiring Keith Alexander as its new CEO.

## C.     Early 2009, Gomez Looked into Opening a Practice at Methodist West and an MHHS Employee Made the "Todd Statement"

Gomez testified that sometime in late 2008 or early 2009, people from Methodist West approached him about practicing at the new hospital, and he testified that he was interested in expanding his practice. This interest was based in part on concerns he had regarding the change in administration at MH/MC and dissatisfaction with "how [his] patients were taken care of." Gomez agreed to pursue opening a practice at Methodist West and began communicating with people, including his partner, Gibson, regarding his new involvement with Methodist. He indicated that he intended to perform surgeries at both hospitals. However, others at MH/MC believed that Gomez might begin working exclusively at Methodist West. Both Portia Willis, who was responsible for marketing for MHHS, and Francesca Sam-Sin, who was a patient relation representative for MHHS, testified that, early on, MHHS administrators believed that Gomez was

4

discussing moving his practice or splitting his practice,[2] including the robotic procedures, to Methodist West, which would be a "[b]ig deal" because MH/MC would lose business.

At some point in the first half of 2009, while Methodist was still considering and negotiating its future relationship with Gomez, Jennifer Todd—a physician liaison with MHHS—contacted Cyndi Pena, who was by that time working as a physician liaison with Methodist West.[3] Pena testified that Todd told her, regarding Gomez, "Be careful. We heard he's going to Methodist and I just want to let you know there's things being said here, and they're pertaining to the bad quality, mortality rates. There was—I heard bad quality, high mortality rates, unnecessary surgeries." Pena further testified that Todd told her the allegations "were serious enough that she was letting me know, because they had heard in meetings that Dr. Gomez had plans to go to Methodist West."

Pena testified that Todd's statement "concerned [her] enough [that she] took the information to [her] CEO as part of [her] job" at Methodist, and she

---

[2] Byron Auzenne, an MHHS employee, testified that "splitter physicians"—or physicians that split their practice between more than one hospital—were very common and estimated that "probably 90 percent or greater" of physicians fell into this category.

[3] The record is unclear regarding exactly when this conversation took place. Pena testified that she was working for Methodist at the time, and that she began working for Methodist on February 23, 2009. Thus, the conversation probably occurred in the spring or summer of 2009, after Pena began working there in February 2009, and before Methodist ultimately decided to enter into an Agreement for Physician Services with Gomez in September 2009.

recommended, "I would be careful to vet him because things like that don't just come out of nowhere." Pena also testified that she believed the things Todd told her because "it was out there already. It's hard to explain. It was in the ether, it was out there. So, in hearing that, I absolutely did believe it. And as I said, because I witnessed it, you know, I witnessed that happening and heard it from multiple physicians." Pena also stated that Methodist West did look into Gomez's qualifications and, because he already had a relationship with the Methodist CEO, Voss, Methodist decided to hire him.

**D.    Also in Early 2009, MH/MC Hired Auzenne**

As Methodist was announcing its plans for a new hospital, MHHS was also making some changes, beginning in early 2009. Prompted by federal-government efforts to publish data about the quality of hospital care and concerns coming from cardiologists and other specialists associated with the hospital, MHHS initiated data-driven programs throughout its system, including in its cardiovascular surgery (CV surgery) program at MH/MC. As part of these efforts, MHHS hired Byron Auzenne.

Early in Auzenne's tenure as the heart and vascular service line leader, he received a recommendation from the Clinical Programs Committee,[4] through its

---

[4]    The Clinical Programs Committee, or CPC, is a committee the Memorial Hermann Physician Network (MHMD), an independent physician organization that is associated with MHHS. MHMD serves to organize physicians to promote quality

Cardiovascular and Thoracic Subcommittee, which was chaired by Gomez at that time, regarding the hospital's use of STS data.

"STS data" refers to data that the Society of Thoracic Surgeons (STS) has compiled in a database administered by the Duke Clinical Research Institute. Among other things, STS tracks seven risk-adjusted procedures that are measured based on information provided from physicians and hospitals. Participants—i.e., the hospital, clinic, or individual surgeon—collect and report data from their treatment of patients, and then transmit that data to STS. STS analyzes the data and processes it into a database that hospitals and healthcare providers across the nation can use to make decisions about care.

The subcommittee chaired by Gomez recommended that the heart and vascular service line at MH/MC present "STS data by facility to the CV surgery subcommittee and each facility's physician group." Based on this recommendation and at the prompting of CEO Alexander, Auzenne started developing "a process for reviewing [the hospital's] STS data (i.e., the raw data that would be reported to STS)."

and safety, and it promulgates new policies and procedures for the system. MHMD and its committees include physicians who have privileges in the hospital system, and it provides some peer-review, development, and oversight functions for the various areas of practice.

MHHS originally focused on mortality data because it "did not want to dive into too many things initially" and "mortality was the most important." Mortality data was also a focus because, according to Auzenne, the hospital "had received word from some of our cardiologists that they were concerned about [the] mortality rate within the program being high."

Auzenne realized in February 2009 that MH/MC had a "weak" process for collecting the raw data that was necessary to report to STS. Among other concerns, Auzenne stated that physicians were all documenting their cases in different and inconsistent ways, which impacted what data could be submitted to STS, and he also realized that physicians were not reviewing the data that was submitted to STS and were not generally aware of what was submitted with regard to their cases.

E.     **Summer 2009, Concerns about the Raw STS Data Led to Peer-Review of All CV Cases**

On June 4, 2009, Auzenne and Alexander met with Dr. Rick Ngo, the chair of MH/MC's peer review and surgical performance improvement committee, and Dr. John Abramowitz, the chief of staff. Alexander wanted to discuss concerns raised by the raw STS data with Abramowitz and Ngo because they were "two physician leaders," and, "in case this turns into peer review, we wanted to engage them early in the process."

MHHS decided to have CV surgery cases reviewed by an outside consultant. Dr. Ngo testified that it was not his idea to send the cases to an external evaluator,

and he felt that MH/MC's Peer Review Committee was "circumvented" by the hiring of the outside peer review consultant. The hospital felt it was important, however, because, out of its four CV surgeons, Gibson was at that time the chief medical officer for MH/MC and Gomez was a member of the board of the Memorial Hermann Physician Network, MHMD, an independent physician organization associated with MHHS. They did not send every case to external peer review, just cases with mortalities, "major complications," or prolonged ICU stays. This review was done based on the medical records of the patients in the relevant cases, along with the physicians' documentation and other records from the patients' time in the hospital. These were sent to an organization called National Peer Review for a full review.

**F.    Fall 2009, Gomez Entered an Agreement with Methodist West, MHHS Made an Internal Presentation of CV Surgical Data**

On September 14, 2009, Gomez signed a confidential Agreement for Physician Services with Methodist West that made him an independent contractor to provide physician services at Methodist. The Agreement also provided that he would hold an "administrative" position as the "Co-Director of the Cardiovascular Robotics Institute" and "Senior Advisor for Cardiovascular Surgery Service Development at [the] West Houston campus." This Agreement was executed in advance of Methodist West's officially opening its cardiovascular surgery program, while the hospital was still building this program.

On September 25, 2009, Gomez was approached by his partner, Gibson. Gomez testified that Gibson told him "that the hospital [MH/MC] had data that showed that I had a high mortality [rate]," which "essentially [said] that I was a bad surgeon." Gomez testified that Gibson said the mortality rate data indicated that there was a "safety issue" and that "they were concerned that the government would look at these numbers and come in and shut down the [cardiovascular] surgery program." According to Gomez, Gibson told him that "because of those reasons you're going to be suspended or you're going to be proctored."

Proctoring is a process by which a surgeon is supervised while providing services. Regarding the significance of having privileges suspended or being "proctored," Gomez testified:

> [T]hat's not something that you keep to yourself. It's impossible. That's something that you have to report for the rest of your life as a physician any time you get privileges at any other hospital and the hospital you're at everyone is going to know, every doctor, every nurse all the—they're going to know that you're a suspended doctor, a proctored doctor. And so basically your reputation is ruined.

Gomez testified that he "was in shock" following this conversation with Gibson. Gomez decided to approach Dr. Ngo to discuss the concerns regarding his mortality rate.

On September 27, 2009, Gomez called Ngo. According to both Gomez and Ngo, Ngo was not aware of the data that MHHS was relying upon to determine that Gomez had a high mortality rate that presented a "safety issue" to the hospital.

10

Gomez testified that he was concerned to learn that the surgical peer review committee knew nothing about the individual surgeon mortality data because, in his mind, MHHS employees "were subverting the process. . . . These types of issues are supposed to go through the peer review process."

Ngo testified that he was the chair of the Surgical Peer Review Committee, and it was the committee's job to review the performance of various medical personnel on a case-by-case basis to evaluate whether the care given in each case was appropriate or whether any problems needed to be addressed. However, he was not concerned that he was unaware of the specific mortality data being used by MHHS. He did not recall specifically asking that there be "a surgeon mortality rate by CV surgeon created," but he also stated, "[I]f someone approached me with that idea, I would have agreed to that." He also believed that the decisions about "what's supposed to be evaluated" would fall "under the umbrella of the quality department at Memorial City," calling it "more of an administrative duty." Ngo further testified that he was not concerned that someone at the hospital was "doing something with data that [he] didn't know about":

> It did not bother me because I don't have the time or access to all that data to do that initial analysis. But then it's my job then to dissect that data and depending on how that data looks and the methodology as far as the acquisition of that data, I wouldn't say that administration engaging and trying to find this data bothered me. I think that's a good thing. I think it's important to look at data in metrics, but the key is to do it the right way with the right methodology.

Ngo also testified that when data raises performance concerns for a particular physician, it was his committee's job to investigate further, and he did so in Gomez's case.

On September 29, 2009, MH/MC held a cardiovascular surgery discussion meeting with medical and administrative hospital leadership, including Auzenne. This meeting involved the presentation of a slide show reviewing data for the CV surgery program. It identified "Primary Areas of Concern" as including the 2009 "overall mortality rate" for the hospital's CV surgeries of 7.1%, comparing that mortality rate to national averages, and it identified "[t]wo CV surgeons [as] the primary drivers in the unfavorable mortality rate." The surgeons were identified only by number—one surgeon's number was listed next to "40%" and another's was listed next to "11.1%." The slide show also contained data reflecting the "current situation" in terms of total volume of surgeries for the hospital and volume by surgeon from 2005–2009, comparing them to national averages. Some of this data was risk adjusted and some of it was not.

On another slide in this presentation, Auzenne presented a "Risk Adjusted Observed to Expected Ratio" (also referred to in testimony and presentations as the "O/E" ratio) for mortalities for four surgeons, again identified only by number. The slide stated that a ratio greater than one—indicating that more deaths were observed to have occurred than would be expected—was "unfavorable." The data

showed that two surgeons had performed better than that marker, with a ratios of zero and 0.0874142, while two surgeons' performance fell below that standard, with ratios of 3.94624 and 7.65733. Again, the surgeons were identified by number only. This slide also showed a "facility overall" ratio of observed to expected mortalities of 2.57661, and it contained a notation stating, "Average STS O/E ratio for like sized Cardiovascular Surgery Programs is .08 to 1.2 [with] 1,200 surgeons working in more than 600 hospitals."

The next slide reflected "Operative Mortality within 30 days" for each of the four surgeons, again identified only by number, and the hospital total from 2005 through 2009, and it provided for comparison the "Cleveland Clinic 2008 Mortality Rates (emergent and non-emergent)." Finally, there was a slide showing the "2009 Operative Mortality Percentage by Physician," with the four surgeons identified by number, breaking down "total mortalities" with both a number of procedures performed and then a percentage reflecting the mortality rate, and then performing a similar breakdown across several specific risk-adjusted procedures.

On October 23, 2009, motivated in part by the complaint Gomez had made to Ngo prior to the slide show, there was another cardiovascular surgery discussion meeting in which Auzenne presented Ngo with essentially the same presentation from September 29. Ngo examined the data generated by Auzenne, and he testified that:

the first part of the slide that jumped out to me was Bullet Point No. 2 [which stated that "[t]wo CV surgeons are the primary drivers in the unfavorable mortality rate" and identified two surgeons, by number, as having 40% and 11.1% mortality rates]. In our world the word "mortality" jumps out. But, you know, the very clear profound statement of two CV surgeons are the primary drivers of this, you know, unfavorable mortality rate, that's the item that jumped out at me.

Ngo testified that when he originally viewed the slide, he "didn't know who they were directing it at because I don't know [who] the five digit identifier . . . pertained to," but Auzenne later shared with him that Gomez was one of the two CV surgeons in question.

Ngo asked Auzenne and Dr. Bobbi Carbonne, who was also in a position of administrative leadership at MH/MC, questions regarding the data such as "where did that statement come from" and "what was your process to generate that conclusion." Ngo also expressed concern that, "by [their] own definition and metrics," Dr. Gibson should also have been reflected as a surgeon with a concerning mortality rate, but he was not. Ngo stated that, to the extent data might be used to "make one surgeon reveal[ed] to be a problem versus another not," that would be a problem, stating, "It's just not right. It's not the fair and objective thing to do." Ngo could not remember the "exact verbal response" to his questions regarding why Gibson's individual mortality rates were not identified as a driver of the overall mortality rates, but he remembered that he asked for "the ability for our [peer review] committee to review every single case of the four surgeons that were

14

involved that Memorial City's administration used to generate the data and let us review each individual case on our own and grade them on our own."

Ngo testified at trial that, looking back, he was bothered by what had happened:

> You know, Dr. Gibson and [Dr. Michael] Macris [the two other CV surgeons at MH/MC] at the time were—well, Dr. Gibson, I believe, he held some very high physician/volunteer/administrative, maybe even paid positions, including at some point being Chief Medical Officer for Memorial City [Hospital], and so it reeks of favoritism.

Ngo testified that, over the next two or three months, the Surgical Peer Review Committee was able to review all of the surgical cases, i.e., all of the cases from which the raw data was taken.

On October 27, 2009, there was a CV surgery quality review meeting. Gomez characterized the meeting as a "peer-review" meeting to review "what the hospital was calling my STS data." This meeting was attended by Gomez, Ngo, Carbone, and Abramowitz in addition to Auzenne. There were no statistics presented at this meeting, just raw data. Auzenne testified that when Gomez saw his own mortality data, "he got upset," and he stated that "this data is statistically invalid." Ngo and Gomez felt that the hospital needed to look at a broader period of data, not just for one year, and that the hospital should be careful to look at risk-adjusted data.

On November 11, 2009, there was a cardiovascular surgery meeting in which the participants, including Auzenne and the CV surgeons, reviewed hospital-wide data for the CV surgery program. No individual surgeon data was examined as part of the meeting, but each surgeon got a sealed and private envelope containing his or her own raw data.

On December 17, 2009, the CV surgeon data and external peer review results were presented to Dr. Ngo's Surgical Peer Review Committee. Ngo requested that Auzenne present the non-risk-adjusted mortality data to his committee and to all four CV surgeons. The peer review process confirmed there was room for improvement but no need for corrective action.

## G. 2010 through 2011, Peer-Reviews are Completed, Gomez Continued Practicing at MH/MC

On February 9, 2010, there was another cardiovascular surgery meeting and, similar to what occurred in November 2009, the presentation focused on hospital-wide performance markers. Again, the CV surgeons got their individual data by envelope, with none of the physicians seeing the individual data of any other physician, but all seeing the performance markers.

Also in February 2010, Ngo, as the chair of the peer review committee, concluded the months-long investigation into the concerns over the quality of the CV surgery program, including Gomez's cases that had resulted in mortalities. Ngo and the committee concluded that there was no "quality of care issue with any of

the four surgeons that had their data presented." Specifically, the committee determined that there was no need for "any proctoring or changing of privileges or anything and the go-forward recommendation was that we would, as we did with every surgeon, continue to closely track and trend and monitor the care of their future patients."

Ngo testified that his committee also made recommendations regarding the surgeon mortality data used by Auzenne. Ngo stated, "One of the major areas that we thought in the process that was extremely flawed was the lack of risk adjustment with each of these individual cases" because "every single case is different. There's a different level of acuity, especially in the specialty that's as complex as cardiovascular surgery."

Ngo also testified that the committee's recognition of those complex factors that are considered on a case-by-case basis led to its recommendation that, going forward, MHHS rely more on STS data, i.e., data that had been risk adjusted rather than raw data, stating:

> [I]n looking at this data we ask what governing society in this country that kind of determines quality metrics and evaluations and so forth for cardiovascular surgeons and that's the Society of Thoracic Surgeons. They have a very clear process and methodology on how to risk adjust individual cases. . . .
> Some surgeries and some patients are just harder than others. And so when you're comparing the hardest patient in a situation to one that's a lay-up and a slam dunk, that's not fair.

17

Regarding Gomez specifically, Dr. Ngo testified, "[I]n the review of those, you know, 20 some-odd cases of Dr. Gomez, there were some where we did feel it could have been an area for particular improvement. But in looking at all of those we didn't feel that there was a major issue with his quality of care." Ngo testified that sharing overall surgeon mortality data that was not risk adjusted was "absolutely not" the right thing to do "because that would hinder referral patterns, damage reputations, et cetera." Without identifying any particular use of the data by MHHS, Ngo testified generally that continuing to show surgeon mortality data without risk adjustment to cardiologists and those who refer for CV surgeries would be "atrocious, damaging, [and] way over the line." Regarding mortality data, Ngo testified that using mortality data—i.e., "if a physician has a hundred surgeries in a year and four of them die"—as a starting point in evaluating areas for improvement was appropriate: "There's nothing inappropriate in saying that's a four percent mortality rate and the next step would be to individually look at each case." Ngo testified that that was what his peer review committee had done in this case. By contrast, the data slide shows and surgeons' meetings had not used only risk-adjusted data but had included raw data.

On February 18, 2010, Dr. Ngo sent each CV surgeon, including Gomez, a letter stating that the issues considered during the third-party review were closed. Gomez testified that he was relieved by the peer review committee's finding, but

18

the peer review process was "difficult" because he felt that "the whole focus was Dr. Mike Gomez, is he a bad surgeon." Gomez stated that when he received the notice from Ngo in February 2010 about the findings of the peer review committee determining that there were no safety concerns regarding his surgical abilities, he thought the issue was resolved: "I thought, okay, they understand, you know, what they did wasn't right. . . . [T]he way they were looking at the numbers wasn't—it's not the right way to do it."

Gomez testified that, for the next year and a half, he had no indication that MHHS employees Auzenne and Alexander were continuing to create and use individual surgeon mortality data, contrary to Ngo's recommendation from the peer review committee.

## H.  November 1, 2011 Meeting of Cardiovascular and Thoracic Surgery Subcommittee and the Auzenne Statement

On November 1, 2011, the Cardiovascular and Thoracic Surgery Subcommittee held its quarterly meeting. According to the minutes, approximately nineteen committee members or interested parties were present, including Gomez. Gomez, however, testified that there were thirty to forty people present.

The power point presented at this meeting included a segment on STS data review. It included a slide showing heart surgery volume by surgeon for twenty MHHS surgeons, who were identified only by a letter. There was a slide showing the "distribution of predicted mortality risk in STS adult cardiac surgery database

2010 by procedure," and there was a chart showing how the actual observed performance of each of the twenty surgeons, again identified by number, compared to STS's predicted mortality and complication rates by procedure type.

Gomez testified that Dr. Macris, who was by that time the chair of the Cardiovascular and Thoracic Surgery Subcommittee, "again" used a 2010 version of the individual surgeon mortality data at the November 1, 2011 meeting. Gomez testified that, as before, at the beginning of the presentation each surgeon received an envelope "to let them know which surgeon they were" in the data shared during the presentation. This presentation did not include any "overall" mortality rates— it looked at the raw numbers of individual doctor mortality rates, as opposed to STS's risk-adjusted procedures. Gomez testified that, after the presentation was over, "we had a discussion about this lie. I got up and said that the data wasn't accurate[.]" Among other issues, Gomez testified at trial that the data presented in this meeting attributed to him a surgical death that he had not been responsible for, and Gomez believed, in any event, that the data was not supposed to be used any longer.

Gomez testified that when he objected that the data "wasn't statistically accurate or valid," Dr. Macris "looked at me and made a gesture to me and said, 'Only the surgeons that look bad need . . . to be concerned.'" Gomez stated that Macris's comment "made it pretty clear that I was one of the red flagged

20

[surgeons]" and that "everybody at the committee knew that I was one of the red-flag surgeons."

Following the November 1 meeting, Gomez testified that he "was upset . . . when this data was presented again," so he spoke to Auzenne and asked him "why is this misleading data . . . being shown again?" Gomez believed that the use of the individual surgeon mortality data had stopped in 2010 following Ngo's recommendation. However, Gomez testified that Auzenne told him after the November 1meeting,

> that he had spoke[n] to CEO Keith Alexander and they had discussed it and they felt that the data needed to be shared, that we needed to be a transparent organization, that this was a safety issue, a safety issue, and that means they can do what they will with the data and that he was going to show it and had shown it to cardiologists at cardiology meetings and other physicians who referred to me so they can make informed decisions when they refer patients.

Gomez testified that he understood Auzenne to be saying that he had been showing the data to Gomez's referring doctors since 2010, and Gomez stated that he "spoke to several doctors after this and others and was able to confirm that what [Auzenne] told me was exactly what he was telling me." Gomez testified that it was "difficult" to hear that this had been going on for the past eighteen months, "but it made it pretty clear what was happening, why I was seeing a decrease in my surgical bodies over that time period, so it kind of made sense; and I just was very,

very upset that again that the peer review process had been subverted and again that my reputation was being ruined."

## I.     2012, The "Whisper Campaign" Led Gomez to Resign his Privileges at MH/MC

Berman testified that, despite doctors' previously high opinion of Gomez prior to 2009, "amongst the cardiologists" affiliated with MHHS, there was eventually a "general consensus" that "Dr. Gomez has a high mortality rate." Berman was asked:

Q.     How real was this whisper campaign that you were seeing?

A.     It was real.

Q.     What do you mean by that?

A.     It means it affects your—it affects—I wouldn't say my opinion, because I like to speak for myself. But I think knowing other cardiologists, a small community, I think it affected their decisions about who they would choose for a surgeon.

Q.     Mortality data, how significant is that to any physician when you're talking about a surgeon?

A.     It's everything. I mean, a patient walks in the hospital, they want to make sure they leave the hospital. One death is more than you want.

Q.     Was there any doubt that the data, wherever it was coming from, whatever it showed, was coming from Memorial Hermann/Memorial City employees?

A.     I would think that's the only place it could come from.

Berman went on testify that the gist of the statements about Gomez was that "he had excessive mortality, which would imply he's not a good surgeon."

However, Berman also testified he never saw or heard any data relevant to Gomez's individual surgical performance. Berman testified that he attended cardiology department meetings and meetings for the Clinical Programs Committee's cardiology subcommittee (which was separate from the cardiovascular and thoracic surgery subcommittee) and he never saw or heard any comment from MHHS personnel about any individual surgeon's patient outcomes, including Gomez's. Berman could not identify the source of the cardiologists' "consensus" that Gomez had high mortalities.

Sam-Sin, who was still employed by MHHS in 2012, overheard a conversation between Gibson and Macris in which Macris "basically insinuated that he didn't want to have Dr. Gomez as a surgeon, and that Dr. Gibson was the one, usually, to clean up the messes after Dr. Gomez." Sam-Sin was surprised to hear Macris's comment because, although she was aware of doctors who "were responsible for some really bad outcomes," she had "never heard anything like that about Dr. Gomez" prior to Macris's statement.

Portia Willis testified that MHHS later instituted a "hiatus" in its marketing of Gomez. When Willis asked why, her boss told her, "I just left administration, I just got out of a meeting, and I can't tell you anything." However, Willis's boss

also "suggested" "something about surgical ability." Willis testified that it was "a big deal" to "question surgical abilities and [then state] that for the time being there would be a complete pause" in marketing of that physician.

From his perspective on the peer review committee, Dr. Ngo testified that he was "not aware of Memorial Hermann treating Dr. Gomez unfairly as far as the letter of the law and the prints, but there's also a lot of body language and tone[.]" He was not personally aware of any employee of Memorial Hermann discussing Gomez's mortality rates or skills as a surgeon outside of the peer review committee meetings, and, as far as he was aware, no Memorial Hermann employee spoke ill of Gomez, but instead "actually spoke very highly of him."

Nevertheless, Gomez testified that in early 2012, at a "general surgery/cardiovascular combined committee meeting," Alexander told Gomez, "you can take your practice and move it on down the road." Gomez testified that, by this time, his practice was "[a] pretty damaged practice."

In April 2012, Gomez resigned his privileges from MHHS and moved his practice entirely to Methodist, where he had had privileges since 2009.

Dr. Todd Price, who was by that time acting as the chief of medicine at MH/MC, testified regarding the end of the partnership between Gibson and Gomez around that same time, stating that he was visiting the hospital when Gibson pulled him aside and "told [him] of the destruction of the practice between him and Dr.

24

Gomez." Price was told that Gibson and Gomez would no longer be working together, that "they were going to be splitting up, that it would be because of quality, and maybe other financial matters." By "quality," Price meant that he understood that there were concerns about "quality of care" such as "the patient outcomes, good versus bad."

## J. Gomez Filed the Instant Lawsuit

On September 17, 2012, Gomez and Gomez P.A. filed suit. Gomez filed suit against MHHS alleging causes of action for business disparagement, defamation, illegal restraint of trade, tortious interference with prospective business relations, and conspiracy. He sought compensatory damages, statutory treble damages, and exemplary damages.

The foregoing evidence concerning the alleged defamation based on the use of the misleading individual surgeon mortality rates and the whisper campaign was admitted at trial.

Gomez also introduced testimony from his damages expert Lara Carter, a forensic accountant. Carter testified that she evaluated the financial impact of the defamation and disparagement on Gomez's practice, specifically the lost profits associated with the decline in his cardiothoracic surgical activity. Carter testified that she compared Gomez's practice prior to the disparagement to his practice after the disparagement and that she used Gomez's records regarding the procedures that

25

he had performed both before and after the disparagement. She also testified that she did not consider Gomez's vein practice[5] because it "can also be done by a physician's assistant or nurse practitioner" and because "it's not the core of Dr. Gomez's practice or what he went to school to do." Carter further stated that, in her experience consulting with other medical practices, doctors frequently maintain similar cosmetic "side" businesses, and, because such procedures can be performed by nurse practitioners, doctors are "able to maintain those two businesses [the main practice and the cosmetic side practice] simultaneously without the cosmetic practice interfering with their primary practice."

Carter testified that she also emphasized Gomez's cardiothoracic surgery practice in calculating the lost profits because Gomez told her that was "his passion" and what "he wanted to do." She also considered his "specific training in robotic surgery." She also considered various statements, tax returns, affidavits, records of procedures performed at Methodist West, and other materials. Carter researched market data in addition to the "source" materials provided by Gomez, "to get an idea of what the market for cardiothoracic surgery was, what people were saying in the industry about the surgery, about the number of surgeons out

---

[5]     In addition to his practice as a CV surgeon, Gomez had a separate practice that did various vein procedures dating back at least until 2005. Even after he left MH/MC and began practicing solely at Methodist West, Gomez continued to operate his separate vein practice.

there, about what the demand was, just to get an indication of what the overall environment was."

Carter testified that Gomez used Gomez P.A. for billing, accounting, and liability purposes. She testified that she treated the "P.A. the same as [Gomez] individually" because, as a solo practitioner, Gomez and Gomez P.A. were "more or less . . . the same person." She evaluated data from 2004 through 2016 and "used a methodology called 'lost profits'" to create "an estimate of what Dr. Gomez's practice would look like based on the information had he not had this damage to his reputation." She extrapolated what his practice would have looked like "had it been able to continue from 2008 on," considering "what it would have earned, what the cost associated with earning those revenues would be" so that she could calculate what his profits would have been. She then looked at what actually happened. She subtracted the actual profits from the profits that she estimated Gomez would have earned "but for" the defamation.

She based her calculations on the determination that Gomez could perform 258 surgeries a year "given the fact that a lot of the procedures would be robotic which can be faster and he also has a broad range of surgical procedures that he can perform." Carter testified that Gomez had performed 288 surgeries in 2004, and his partner had performed 260 that same year. In 2005–2007, Gomez was training on the robotic equipment and had started his vein clinic, so he had a

27

decrease in procedures. Carter stated that between 2009 and 2010, "there was a significant decline in his practice in the number of procedures he performed and the related collections," so 2010 was the year that she began calculating lost profits. Regarding future lost profits, Carter calculated a range of damages because, "given the context and given the fact that we don't exactly know what the lingering effects of the damage to Dr. Gomez's reputation are and will be in the future, I felt a range was appropriate."

Carter testified that, based on the data she examined, she believed that Gomez should have been able to achieve the 258 procedures a year if he had been "allowed to grow his practice uninhibited." She saw no indication that his practice had begun to recover, stating, "In fact, there continues to be a decline." She testified to a range of damages based on a variety of scenarios projecting no growth of his practice, a 4.6% rate of growth in the event that he would have been able to recover some of his practice in the future, or a more conservative approach in which she considered that he would not have been able to achieve the 258 surgeries a year had the defamation never occurred. She estimated that his damages could range from approximately $2 million to $5.6 million.

Carter further testified that she considered "other probable causes" that could have accounted for the lost profits. She considered general market conditions and Gomez's own actions, but she determined that "there was no

28

indication that there was another cause for [the] decline [in his practice] other than the defamation and the damage to his reputation." She stated that, when she reviewed the data for the other surgeons at MHHS, Macris and Gibson, Gomez had similar numbers of procedures until 2009, when the numbers began to diverge. She testified that both Macris and Gibson had experienced an increase in their practices since 2009, but Gomez's practice had declined. Based on this data, Carter concluded that there was no market-driven decline.

Carter addressed representations from MHHS that Gomez was making more money now than he did before the defamation. She testified that, in addition to his present income, Gomez should also have realized income from a thriving cardiovascular surgery practice, which he had not been able to do because of the defamation. She testified that the income Gomez made from his vein practice would not have cut into his surgical practice because, if the surgical procedures had been available, he could have turned over the vein procedures to a nurse practitioner. Carter also testified that the vein practice is not driven by referrals from the same source as the cardiovascular surgery, so the vein practice income was not as susceptible to damage from the defamation and disparagement as Gomez's surgical practice was.

Other witnesses testified regarding damages as well. Former colleagues, like Berman, testified that, at times during his last couple of years at MHHS and as a

29

result of the deterioration in his reputation, Gomez was "very stressed, very frustrated, very angry and worried." Berman testified that it was "very, very upsetting" to watch something like that happen to a colleague and friend.

Pena, who had taken the concerns mentioned by Todd to her boss, testified that, looking back, she "was disappointed in [herself] too, that I went to my boss to block—basically, be careful about employing him [at Methodist]." She testified that she saw how everything impacted Gomez, stating that "he was stressed and he was disappointed and he was angry." She testified:

> So what I saw with Dr. Gomez was a person who I had seen over the course of years now who had developed a practice, developed a reputation, had built up a name for himself, had referral volume, he had, you know, marketing—marketing was putting dollars behind procedures that he was doing in general. And so what I—my personal opinion, what I saw, was a person who felt like they're trying to take something from me that I have earned, and that was his name. That was what I heard.

Gomez's wife, Jennifer Gomez, testified about his distress. She recounted receiving a call from him in September 2009, when he first learned that MHHS was considering options such as proctoring him or suspending his privileges. She said that she "could just hear . . . the just sadness and shock in his voice," and she remembered him saying, "I don't think I'm going to operate anymore." She had never received a phone call like that from him before. During the four months that the peer review committee was reviewing his clinical data, she testified that Gomez was "extremely stressed":

30

Well, not sleeping or oversleeping, one or the other. Just, you know, not eating. He lost a lot of weight. . . . Pacing. He's a pacer. I mean, pacing back and forth, back and forth. Withdrawn. And that was probably the hardest one for me. . . .

[He was j]ust withdrawn. Just, like, vacant, somewhere else, just preoccupied. And, you know, his dad said the other day, and it really struck me. He never made this anyone else's burden. He never was ugly. He never lashed out at me over it. He just stuffed it all inside and went and crawled in a hole. So, yeah, that was hard to see.

Jennifer Gomez also testified that she saw him on November 1, 2011, when he realized that MHHS was still using the individual surgeon mortality data. She testified that he was frustrated and "blown away." She said that neither of them could believe what was happening because it was "[s]hocking. Just utter shock." When asked how he moved on in light of "what had been done with his practice," she stated:

I mean, it's a process, right? You know, that initial shock, with time, wore off a little bit. It's kind of like, you know, when you have a big loss in your life and, you know, you try and establish a new normal, because that's just the type of person he is. You know, he's going to try and make the best of a bad situation. But a sadness. Just a little down and kind of going through the motions.

Jennifer testified that this was "[t]he polar opposite" of how he was before the defamation. Before, "he was vivacious" and "going after it." He felt "that he was really doing what he was meant to do . . . and making his contribution." She testified:

I mean, he really loved his work. He loved his patients. And to not be doing that left like a big hole in him. That's the best way to describe it like, like part of him had just been yanked out.

31

She stated that his vein practice has not "filled the hole": "[H]e cares for his vein patients, and, you know, he can help some of them alleviate their pain, and he cares for them very much; but is it what cardiac surgery is to him? No. Not even close."

Jennifer concluded:

I feel like some people know from a young age what they want to do. Some people—I—in my opinion, it's like a gift. I'm not that person. I mean, I enjoy [my job], but I don't know that it was like a gift. Do you know what I mean? I feel like [cardiac surgery] was his gift. I feel—I mean, [it] sounds kind of corny, but like God gave that to him, and he felt like that was his way to give back. He really did. And he—he was good at it.

And, you know, just to have that inability to do that, something that you love, that you worked hard for, that you feel you're a fit for. It's—it's hard to even still see him now. I mean, there are times when I honestly—there are just certain things that have broken my heart over the years, just little incidences that make me sad. . . .

[Like,] in our neighborhood, he had just a great reputation and people would refer their family members. And I remember when we found out our neighbor across the street had something done and they were just kind of hush-hush about it, and, you know, I mean, it was obvious like, you know, they didn't want his input. They obviously chose not to talk with us and pursue him, and it made me feel bad for him, because he knew but he never, like, said it to me, and I felt bad for him.

Jennifer testified that two years before trial, after the defamation had occurred, Gomez had to sit for renewing his cardiothoracic board certification, and he was "restudy[ing] everything," "staying up until 1:00 and 2:00 in the middle of the night, busting his butt," but "he looked at me and goes, ['It's] kind of crazy, I mean, here I am, and do you even really think I'm a cardiac surgeon anymore?[']"

32

She testified that he was "a little apprehensive about seeing some of the guys from his fellowship."

The jury charge stated, in relevant part:

Answer the following questions with respect to Byron Auzenne's alleged statement that "he had spoke[n] to CEO Keith Alexander and they had discussed it and they felt that the data needed to be shared, that we needed to be a transparent organization, that this was a safety issue and that means they can do what they will with the data and that he was going to show it and had shown it to cardiologists at cardiology meetings and other physicians and who referred to me so they can . . . make informed decisions when they refer patients."

1. Did Memorial Hermann publish the statement?

Publish means intentionally to communicate the matter to a person other than Dr. Gomez who is capable of understanding its meaning.

Regarding Todd's statement to Pena that "I heard bad quality, high mortality rates, unnecessary surgeries," the jury likewise was asked whether the statement was published. There were also questions submitted to the jury asking whether the same statements by Todd and Auzenne disparaged Gomez P.A.

Finally, the jury charge asked, "Do you find by clear and convincing evidence that, at the time of the statements listed below Memorial Hermann knew it was false as it related to Dr. Gomez, or made the statement with reckless disregard as to its falsity?" The charge asked the jury to make this finding with regard to both Todd's statement that "I heard bad quality, high mortality rates, unnecessary surgeries" and Auzenne's statement made to Gomez following the

33

November 1 meeting that "he was going to show [the data] and had shown it to cardiologists at cardiology meetings and [to] other physicians."

The jury found in favor of Gomez on his defamation claims and Gomez P.A.'s business disparagement claims. The jury rejected Gomez's restraint-of-trade claim. In response to the question asking whether the jury found clear and convincing evidence that the Todd and Auzenne statements were made knowing that they were false or with reckless disregard as to their falsity, the jury answered "No" for the Todd statement and "Yes" for the Auzenne statement.

The jury likewise awarded Gomez and Gomez P.A. compensatory and exemplary damages. Specifically, the jury awarded Gomez $304,500 for past injury to his reputation and $700,000 for probable future injury to his reputation arising out of the defamatory statement made by Todd. The jury also awarded Gomez $456,750 for past injury to his reputation, $1,050,000 for probable future injury to his reputation, and $365,000 for past mental anguish in connection with the defamation by the Auzenne data. The jury likewise found malice in connection with MHHS's use of the Auzenne data and awarded exemplary damages of $500,000.

The jury awarded Gomez P.A. $304,000 in past lost profits and $700,000 in future lost profits for the disparagement related to Todd's statement and the whisper campaign. The jury awarded Gomez P.A. $456,750 in past lost profits and

34

$1,050,000 in future lost profits for the disparagement related to the Auzenne data. The jury further made an affirmative finding of malice in connection with the Auzenne data and awarded Gomez P.A. $500,000 in exemplary damages.

The jury indicated that the verdict was not unanimous. However, it also provided an additional certification that the jury was unanimous in answering questions regarding malice in connection with the Auzenne data and the awards for exemplary damages.

The trial court rendered its final judgment based on the jury's verdict. The trial court also ruled, in the final judgment, that the defamatory statements were not covered by qualified privilege. It awarded damages consistent with the jury's verdict plus pre- and post-judgment interest and costs.

## Analysis

### A.    Publication

In its first issue on appeal, MHHS argues that the allegedly defamatory statement by Auzenne as identified in the jury charge was not published to a third party. The jury charge set out this statement as follows:

> [Auzenne] had spoke[n] to CEO Keith Alexander and they had discussed it and they felt that the data needed to be shared, that we needed to be a transparent organization, that this was a safety issue and that means they can do what they will with the data and that he was going to show it and had shown it to cardiologists at cardiology meetings and other physicians and who referred to me so they can . . . make informed decisions when they refer patients.

35

The charge asked, "Did Memorial Hermann publish the statement?" It defined "publish" as meaning, "intentionally to communicate the matter to a person other than Dr. Gomez who is capable of understanding its meaning."

The statement set out in the charge quotes Gomez's testimony regarding his conversation with Auzenne. During deliberations, the jury asked, with regard to this question, "[D]oes the court want to know if the <u>exact</u> statement as quoted was published or if the data referred to in the statement is being published?" The trial court responded, "The jury is instructed to answer Questions2b(1) and 3b(1) to the best of the jury's ability as the jury understands the questions." The jury found that the statement was published.

### 1. *Standard of Review*

This issue is essentially a no-evidence point, as MHHS asserts that the statement identified in the jury charge was not published as a matter of law. Neither party challenges the adequacy of the charge in this case, and the statements of law contained in the charge are generally correct; thus, the sufficiency of the evidence is measured against the charge actually submitted, not some other law left unidentified in the charge. *See Osterberg v. Peca*, 12 S.W.3d 31, 55 (Tex. 2000).

We review no-evidence points by considering the evidence in the light most favorable to the verdict, disregarding evidence contrary to the verdict unless a reasonable jury could not. *Anderson v. Durant*, 550 S.W.3d 605, 616 (Tex. 2018);

36

*City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). "More than a scintilla of evidence exists when reasonable and fair-minded people could reach different conclusions based on the evidence." *Anderson*, 550 S.W.3d at 616 (citing *Burbage v. Burbage*, 447 S.W.3d 249, 259 (Tex. 2014)). It is the jury's role to evaluate the credibility of the witnesses and reconcile any inconsistencies or conflicts in the evidence, and the jury may "believe all or any part of the testimony of any witness and disregard all or any part of the testimony of any witness." *Id.* (quoting *Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 774–75 (Tex. 2003)); *City of Keller*, 168 S.W.3d at 819–20. "We must uphold the jury verdict if any reasonable version of the evidence supports it." *Anderson*, 550 S.W.3d at 616.

"Actionable defamation requires . . . publication of a false statement of fact to a third party," in addition to other elements. *Id.* at 617–18 (setting out elements of defamation); *see also Forbes Inc. v. Granada Biosciences, Inc.*, 124 S.W.3d 167, 170 (Tex. 2003) ("To prevail on a business disparagement claim, a plaintiff must establish that (1) the defendant published false and disparaging information about it, (2) with malice, (3) without privilege, (4) that resulted in special damages to the plaintiff."). "'Publication' occurs if the defamatory statements are communicated orally, in writing, or in print to some third person who is 'capable of understanding their defamatory import and in such a way that the third person did so understand.'" *Exxon Mobil Corp. v. Rincones*, 520 S.W.3d 572, 579 (Tex.

2017) (quoting *Austin v. Inet Techs., Inc.*, 118 S.W.3d 491, 496 (Tex. App.—Dallas 2003, no pet.)).

"[A]n allegedly defamatory publication should be construed as a whole in light of the surrounding circumstances based upon how a person of ordinary intelligence would perceive it." *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114 (Tex. 2000); *see also Bentley v. Bunton*, 94 S.W.3d 561, 579 (Tex. 2002) ("It is well settled that 'the meaning of a publication, and thus whether it is false and defamatory, depends on a reasonable person's perception of the entirety of a publication and not merely on individual statements.'"). "Because a publication's meaning depends on its effect on an ordinary person's perception, courts have held that under Texas law a publication can convey a false and defamatory meaning by omitting or juxtaposing facts, even though all the story's individual statements considered in isolation were literally true or non-defamatory." *Turner*, 38 S.W.3d at 114.

### 2.    *Analysis*

MHHS argues that the defamatory statement as set out in the charge was not published to a third party. It argues that, because publication to a third party is an essential element of Gomez's defamation and business disparagement claims, and the statement identified in the charge was not published as a matter of law, Gomez's defamation and business disparagement claims as they relate to this

38

statement also fail. In making this argument, MHHS asserts that the statement in the charge must be read narrowly and that "[t]he charge cannot be construed to ask the jury about unspecified statements about undefined 'data' to unidentified third parties." Rather, MHHS asserts that the "literal language of the jury charge limits the scope of review," and, by its own language, the statement identified in the charge was made by Auzenne to Gomez and not to a third party.

The jury charge here identified the alleged defamatory statements made by Auzenne by quoting a portion of Gomez's testimony. Gomez testified that after Ngo and the peer review committee reviewed his surgical mortality rates on a case-by-case basis, determined that there were no quality of care concerns with regard to Gomez's performance as a surgeon, and recommended that MHHS quit using the individual surgeon mortality data and instead conform its data collection and review to those measures set out by the Society of Thoracic Surgeons, he thought his issues with the misleading data were resolved. On November 1, 2011, the Cardiovascular and Thoracic Surgery Subcommittee held its quarterly meeting and presented a report on the STS 2010 Database Review.

Gomez testified that there were about thirty to forty people present at the November 1, 2011 meeting, including doctors, administrators, and nurse administrators. He testified that Dr. Macris again used a 2010 version of the individual surgeon mortality data that identified individual surgeons using a code.

Gomez testified that, at the beginning of the presentation, each surgeon received an envelope "to let them know which surgeon they were" in the data shared during the presentation. He testified that, after the presentation was over, "we had a discussion about this lie. I got up and said that the data wasn't accurate[.]" Among other issues, Gomez testified at trial that the data attributed to him in this presentation included a surgical death that he had not been responsible for, and Gomez believed, in any event, that the data was not supposed to be used any longer.

Gomez testified that when he objected that the data "wasn't statistically accurate or valid," Dr. Macris "looked at me and made a gesture to me and said, 'Only the surgeons that look bad need . . . to be concerned.'" Gomez stated that "made it pretty clear that I was one of the red flagged [surgeons]" and that "everybody at the committee knew that I was one of the red-flag surgeons."

When Gomez later confronted Auzenne to question why the misleading individual surgeon mortality data was still being used, Gomez testified that Auzenne told him:

> that [Auzenne] had spoke[n] to CEO Keith Alexander and they had discussed it and they felt that the data needed to be shared, that we needed to be a transparent organization, that this was a safety issue, a safety issue, and that means they can do what they will with the data and that he was going to show it and had shown it to cardiologists at cardiology meetings and other physicians who referred to me so they can make informed decisions when they refer patients.

40

Gomez testified that he understood Auzenne to be saying that he had been showing the misleading data to Gomez's referring doctors since 2010.

The jury charge specifically referenced this testimony, including Auzenne's admission to Gomez that he had provided the data "to cardiologists at cardiology meetings and other physicians and who referred to [Gomez]." Gomez presented evidence that the data was published by being used at several meetings, including the one on November 1, 2011, at which approximately thirty to forty health care professionals were present, and that Macris made it clear that Gomez was one of the "red-flagged" surgeons.

Several doctors and other medical professionals testified that they were aware of the individual surgeon mortality data and that they knew that Gomez was identified by that data as a surgeon with a high mortality rate. For example, Gibson, Gomez's then-partner, knew as far back as 2009 that Gomez's individual mortality data numbers were a cause for concern at MHHS and said as much to Gomez. Doctors Ngo and Macris also were aware that Gomez was identified by the data as a problem surgeon. Gomez testified that Auzenne acknowledged that he "was going to [the data] it and had shown it to cardiologists at cardiology meetings and other physicians and who referred to me so they can . . . make informed decisions when they refer patients." Berman likewise testified that the cardiologists came to believe that Gomez had high mortality rates. Finally, the

record contains copies of the slide shows and reports that used the individual mortality data.

Furthermore, the doctors and other personnel to whom this data was disseminated understood its defamatory nature. Ngo and Berman both testified that evidence of a poor mortality rate would affect referrals and a doctor's reputation. Berman testified that he believed that Gomez's mortality rate did actually impact other cardiologists' opinion of him. Data experts like Rachel Dokholyan, a project leader for the STS databased, and Dr. Baron Hamman, a cardiac surgeon and expert on cardiovascular quality metrics, testified that these statistics were important and that doctors used the data to make decisions about their patient's care. Gomez himself testified that he objected to the improper data, and Macris made it clear that Gomez was one of the "red-flagged" surgeons.

Viewed in the light most favorable to the jury's verdict, we conclude that there was evidence that MHHS, through Auzenne, published the individual surgeon mortality data by presenting it to other doctors, who were capable of understanding its defamatory import and who did in fact understand the data in that way. *See Anderson*, 550 S.W.3d at 616; *see also Rincones*, 520 S.W.3d at 579 ("'Publication' occurs if the defamatory statements are communicated orally, in writing, or in print to some third person who is 'capable of understanding their defamatory import and in such a way that the third person did so understand.'").

42

MHHS further argues that defamation requires proof of a specific statement and interpreting the charge in a non-literal way would be "unfair." However, "[w]e are to read jury instructions like jurors do—with common sense." *See Nip v. Checkpoint Sys., Inc.*, 154 S.W.3d 767, 772 n.3 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *see also City of Brenham v. Honerkamp*, 950 S.W.2d 760, 764 (Tex. App.—Austin 1997, pet. denied) (holding that reading jury questions "in a common-sense manner" supported conclusion that jury question "fairly placed the liability issue before the jury" and noting that "[t]he trial court has broad discretion in submitting jury questions, subject only to the requirement that the submitted questions fairly place the disputed issues before the jury"); *Broughton v. Humble Oil & Ref. Co.*, 105 S.W.2d 480, 485 (Tex. App.—El Paso 1937, writ ref'd) ("Theoretical perfection of expression as to each isolated sentence is not the end sought, else there would seldom be found unobjectionable instructions. Natural, not strained, constructions should prevail."). "If possible, we must interpret the jury's findings to avoid a 'nonsensical result' and in a manner that upholds the judgment." *Nip*, 154 S.W.3d at 772 n.3 (quoting *Otis Spunkmeyer, Inc. v. Blakely*, 30 S.W.3d 678, 685–86 (Tex. App.—Dallas 2000, no pet.)); *see also Jackson v. U.S. Fidelity & Guar. Co.*, 689 S.W.2d 408, 411–12 (Tex. 1985) (noting, when case involved determination of fact, rather than determination of law, that "if the

jury findings are ambiguous or unclear, the appellate courts must try to interpret the findings so as to uphold the judgment").

Gomez identified specific defamatory statements—i.e., Auzenne's use of the individual surgeon mortality data. Nothing in the record indicates that the crux of Gomez's complaint was a statement that Auzenne made to *him*. Rather, the entire case revolved around Auzenne's use of the individual surgeon mortality data, even after the Surgical Peer Review Committee and others recommended against its use. The use of this data was referenced in the jury charge, and, as we discussed above, the record contains evidence that the data was published to third parties.

We overrule MHHS's first issue.

## B.     Causation of Damages

In its second issue, MHHS asserts that Gomez failed to establish causation with respect to his claims of defamation and business disparagement arising out of Todd's alleged statement to Methodist West's physician liaison, Pena, regarding Gomez: "I heard bad quality, high mortality rates, unnecessary surgeries."

In its fourth issue, MHHS argues that there was no evidence of causation generally, asserting that there was no evidence of any loss of referrals caused by defamation, no evidence that Gomez's reputation was harmed by defamation, and no evidence to support an award of past mental anguish.

We consider these issues together.

## 1.	Standard of Review

These are both no-evidence complaints that we review by considering the evidence in the light most favorable to the verdict, disregarding evidence contrary to the verdict unless a reasonable jury could not.  *Anderson*, 550 S.W.3d at 616; *City of Keller*, 168 S.W.3d at 822, 827.

"Actionable defamation requires (1) publication of a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) that proximately caused damages."  *Anderson*, 550 S.W.3d at 617–18.  Proximate cause encompasses both foreseeability and cause in fact.  *Id.*; *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010).  "A defendant's action is the cause in fact of damages 'if it was a substantial factor in causing the injury and without which the injury would not have occurred.'"  *Anderson*, 550 S.W.3d at 618.

"General damages include non-economic losses, such as mental anguish and loss of reputation," while special damages represent specific economic losses. *Id.* (citing *In re Lipsky*, 460 S.W.3d 579, 593 (Tex. 2015)). "Non-economic damages offer a pecuniary remedy for non-pecuniary harm and are not amenable to calculation with 'precise mathematical precision.'" *Id.* (quoting *Brady v. Klentzman*, 515 S.W.3d 878, 887 (Tex. 2017), and citing *Waste Mgmt. of Tex., Inc. v. Tex. Disposal Sys. Landfill, Inc.*, 434 S.W.3d 142, 153 (Tex. 2014)).  Thus, the

jury has "latitude" in determining a non-economic damages award, but it is not granted "carte blanche" in deciding the matter; rather, "the jury must award 'an amount that a reasonable person could possibly estimate as fair compensation.'" *Id.* (quoting *Bentley*, 94 S.W.3d at 605, and *Waste Mgmt.*, 434 S.W.3d at 153).

> Regarding evidence of lost profits, the supreme court has held:

> The rule concerning adequate evidence of lost profit damages is well established: Recovery for lost profits does not require that the loss be susceptible of exact calculation. However, the injured party must do more than show that they suffered some lost profits. The amount of the loss must be shown by competent evidence with reasonable certainty. What constitutes reasonably certain evidence of lost profits is a fact intensive determination. As a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained. Although supporting documentation may affect the weight of the evidence, it is not necessary to produce in court the documents supporting the opinions or estimates.

*ERI Consulting Engineers, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010) (quoting *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992)).

Regarding mental anguish damages, the record must contain "direct evidence of the nature, duration, and severity of [the plaintiff's] mental anguish, thus establishing a substantial disruption in the plaintiff['s] daily routine," or "evidence of a high degree of mental pain and distress that is more than mere worry, anxiety, vexation, embarrassment, or anger." *Anderson*, 550 S.W.3d at 618–19. However, "[g]eneralized, conclusory descriptions of how an event affected a

person are insufficient evidence on which to base mental anguish damages." *Id.* at 619.

### 2. *Causation of Damages Arising from Todd's Statement*

In its second issue, MHHS argues that Gomez has "absolutely no proof that [Todd's] statement links causally to any award of damages" and that "[t]here is no evidence that this statement connects to any reputational harm or lost profits from fewer referrals." This assertion misrepresents the nature of the evidence presented at trial.

MHHS argues that Pena never testified that Todd's statements affected her opinion of Gomez, and it construes Pena's testimony as stating that she merely reported the concerns to the CEO of Methodist West and recommended extra vetting of Gomez. This ignores Pena's testimony that she "absolutely did believe" Todd's statements. Pena testified that she recommended, "I would be careful to vet him because things like that don't just come out of nowhere." Pena also testified that she believed the things Todd told her because "it was out there already. It's hard to explain. It was in the ether, it was out there. So in hearing that, I absolutely did believe it. And as I said, because I witnessed it, you know, I witnessed that happening and heard it from multiple physicians." The fact that Methodist West did eventually hire Gomez does not mean that his reputation suffered no harm from the defamatory statements and the resulting extended

vetting process, as further evidenced by the fact that, at Methodist West, Gomez performs fewer cardiovascular surgeries—surgeries for which he had trained and which he had developed a highly marketable technique prior to the defamatory statements made about him.

MHHS also relies on Pena's testimony and the testimony of other doctors indicating that Gomez had a good reputation and had been successful at Methodist, arguing that there was no evidence that anyone believed Todd's representations or thought less of Gomez and, thus, there was no causation of harm to Gomez's reputation. Evidence that some people still had a good opinion of Gomez, however, does not support a conclusion that he suffered no harm to his reputation or business. MHHS's representation of the evidence ignores Pena's testimony that she believed the representations that Todd made. It also ignores the testimony of witnesses like Dr. Berman and others that the "whisper campaign" was real and that it impacted Gomez's reputation and business.

Berman testified that the gist of the statements about Gomez was that "he had excessive mortality, which would imply he's not a good surgeon." Berman also testified that the "end result" was that the patients Gomez used to receive from Berman now went to see either Macris or Gibson. Berman also testified that other cardiologists believed that Gomez was a bad surgeon and that the mortality data affected their decisions to refer to Gomez. Sam-Sin testified that she overheard

Macris make disparaging remarks to Gibson about Gibson having to "clean up" after Gomez. Willis testified that the hospital decided to withdraw marketing support from Gomez and that her boss suggested that this was because of concerns over his "quality of care," which was "a big deal." Carter, Gomez's damages expert, testified that Gomez's CV surgery practice never approached the levels it had reached before the publication of the defamatory statements and that most of his practice remained in other thoracic surgeries and vein procedures. This constitutes evidence that some people did believe the false information about Gomez.

MHHS also argues that Gomez presented no evidence supporting the jury's award of lost profit damages. It asserts that there was no evidence that Gomez lost referrals or business because of Todd's statement to Pena and specifically noted that Pena's role "was to recruit and hire physicians—not to interface with patients and make recommendations on surgeons." MHHS argues that, because Methodist ultimately hired Gomez and he continued to receive some referrals from other doctors, there is no evidence that Todd's statement caused Gomez to incur any lost profits. MHHS's argument ignores Gomez's testimony that he did not intend to quit practicing at MH/MC but that he eventually felt that he had no choice to resign his privileges there. It also ignores the change in the nature of Gomez's practice after the false information was published. Gomez and Carter both testified that,

after the defamation, Gomez was performing significantly fewer cardiovascular surgeries and that the nature of many of the surgeries and procedures he performed required less skill than the surgeries he was performing before the defamation was published. Thus, there was evidence that any losses attributed to the fact that he only worked at Methodist could have been caused by the defamation forcing him to leave MH/MC.

MHHS also ignores the entire testimony of Carter, who provided detailed facts regarding the nature of Gomez's practice both before and after the alleged defamation. Furthermore, Pena herself acknowledged that, following the defamation, she observed Gomez—who had previously been a sought after, respected surgeon with good "referral volume"—struggle to defend his good name and his surgical practice.

Specifically, Carter testified that Gomez suffered a total of approximately $5.6 million dollars in lost profits. She supported these conclusions with data regarding Gomez's surgical referrals and number of surgeries performed both before and after the defamation. The jury awarded Gomez $304,000 in past lost profits and $700,000 in future lost profits attributable to Todd's statement representing circulating rumors that Gomez was a "bad quality" surgeon with "high mortality rates, [and] unnecessary surgeries." Thus, the apportioning of $1,004,000 in damages resulting from Todd's statement out of the total amount of

$5.6 million in damages testified to by Carter is not unreasonable. *See Swinnea*, 318 S.W.3d at 876 (holding that recovery for lost profits does not require "exact calculation" but instead "must be shown by competent evidence with reasonable certainty"; this is "a fact intensive determination" and must be "based on objective facts, figures, or data from which the amount of lost profits can be ascertained").

We overrule MHHS's second issue.

### 3. Causation of Damages Arising from Auzenne's Data

In its fourth issue, MHHS argues that "[t]here is no evidence of causation generally." MHHS argues that Gomez's defamation and business disparagement claims based on Auzenne's statement "fail for lack of evidence that the unspecified statements about data actually caused any harm." MHHS asserts that Gomez "never actually connected Gomez's lower surgical numbers to any particular instance of defamation." *See Brady*, 515 S.W.3d at 887 ("Losing a job or business opportunities . . . is not evidence of loss of reputation unless the evidence connects it to the defamation."). MHHS essentially argues that because there were multiple possible reasons for Gomez to lose business, the evidence did not connect the loss to the defamation. MHHS argues that Gomez's "loss of referrals" theory of recovery is "wildly speculative," and it argues that no witnesses testified that they had stopped or reduced their referrals to Gomez because of any concerns about his reputation.

51

However, Carter presented evidence of the decline in Gomez's referrals and cardiovascular surgeries and assigned specific amounts of damages to that decline. Gomez himself and others testified regarding the change in his reputation—that he went from being highly respected to having numerous colleagues who thought he was effectively a "bad" surgeon because of his mortality rate and ceased referring patients to him. Carter also stated that there was a noticeable decrease in volume in Gomez's practice between 2009 and 2010, when Auzenne first used the individual surgeon mortality data, that the lower volume continued for years, and that Gomez's surgical practice has never really recovered.

MHHS likewise argues that there is "no evidence that unspecified statements about data connect to any harmed reputation," noting that "the witnesses at trial universally agreed that Gomez's reputation is good" and that some doctors still refer patients to Gomez. *See id.* ("[E]vidence of loss of reputation should be more than theoretical. Showing that the community was aware of and discussed the defamatory statements is not enough; there must be evidence that people actually believed the statements and the plaintiff's reputation was actually affected.") (internal citation omitted). Again, as set out above, this misconstrues the evidence. Some doctors still believed that Gomez had a good reputation and was a good cardiothoracic surgeon, but the jury was entitled to credit the numerous witnesses who testified that other doctors came to believe that Gomez was a bad surgeon

52

with high mortality rates. The jury had "latitude" in awarding damages arising out of the harm to Gomez's reputation among his fellow health professionals. *See Anderson*, 550 S.W.3d at 618.

MHHS also argues that there is no evidence supporting the jury's award for past mental anguish damages arising from the Auzenne statement. "Generally, an award of mental anguish damages must be supported by direct evidence that the nature, duration and severity of mental anguish was sufficient to cause, and caused, either a substantial disruption in the plaintiff's daily routine or a high degree of mental pain and distress." *Brady*, 515 S.W.3d at 891.

Here, many of Gomez's professional friends and colleagues noted the profound change in Gomez's demeanor following the defamatory statements. Berman testified that, at times during his last couple of years at MHHS and as a result of the deterioration in his reputation, Gomez was "very stressed, very frustrated, very angry and worried." Berman testified that it was "very, very upsetting" to watch something like that happen to a colleague and friend.

Pena testified that she saw how everything impacted Gomez, stating that "he was stressed and he was disappointed and he was angry." She testified:

> So what I saw with Dr. Gomez was a person who I had seen over the course of years now who had developed a practice, developed a reputation, had built up a name for himself, had referral volume, he had, you know, marketing—marketing was putting dollars behind procedures that he was doing in general. And so what I—my personal opinion, what I saw, was a person who felt like they're trying to take

53

something from me that I have earned, and that was his name. That was what I heard.

Significantly, Jennifer Gomez, Gomez's wife, testified that her husband was "extremely stressed" by the defamation, that it was an "utter shock," and that it was "exhaustive" for the "entire family." She testified that Gomez was "not sleeping or oversleeping, one or the other." He was "not eating" and "lost a ton of weight." She testified that he paced and was withdrawn and "vacant." Jennifer stated that Gomez "just stuffed in all inside and went and crawled in a hole." She equated his losing his reputation as a surgeon and losing the ability to work as a surgeon to "a big loss," causing him to "establish a new normal."

Jennifer testified that Gomez created the "new normal" but was "kind of going through the motions," which was "[t]he polar opposite" of how he was before the defamation. Before, "he was vivacious" and "going after it." He felt "that he was really doing what he was meant to do . . . and making his contribution." She testified that Gomez's career as a cardiac surgeon was like a gift from God and having it taken away left a hole:

> I mean, he really loved his work. He loved his patients. And to not be doing that left like a big hole in him. That's the best way to describe it like, like part of him had just been yanked out.

She testified that the entire process caused him to question whether he was "even really . . . a cardiac surgeon anymore" and left Gomez feeling "like he has this huge scarlet letter on him."

54

This testimony constitutes direct evidence that the nature, duration and severity of mental anguish was sufficient to cause, and caused, either a substantial disruption in Gomez's daily routine or a high degree of mental pain and distress. *See Brady*, 515 S.W.3d at 891. Gomez provided evidence of more than "mere worry, anxiety, vexation, embarrassment, or anger." *See Anderson*, 550 S.W.3d at 619. The stress and mental pain from the defamation caused sleep disturbances and weight loss. It effected a material change in his outlook and "left a hole" in his life.

In *Bentley v. Bunton*, the plaintiff spent time worrying at home and was distressed about the impact the defamatory statements had on him and his family; his wife testified that he lost sleep and would never be the same; and his demeanor changed. 94 S.W.3d at 606–07 (concluding that plaintiff presented legally sufficient evidence of mental anguish but remanding for reconsideration of "excessive" multi-million dollar award); *see also Anderson*, 550 S.W.3d at 619 (stating that court eventually upheld suggested remittitur in *Bentley* "that left $150,000 in mental anguish damages on the table").[6] Here, the evidence indicated that Gomez likewise experienced a significant and extended change in his personality. He worried that he could not provide for his family, he withdrew and

---

[6]     MHHS does not appear to argue that the mental anguish award was excessive, merely that there was no evidence to support it. However, we note that the mental anguish award here was $365,000, which is considerably less that the multi-million dollar mental anguish award the supreme court found excessive in *Bentley*.

55

"crawled into a hole," he felt like he was marked with "a huge scarlet letter," he had sleep disturbances and lost weight due to the stress. He moved on to a "new normal," but the loss of his reputation left a hole that has not been filled by other professional endeavors. *See also Anderson*, 550 S.W.3d at 620 (upholding mental anguish award based on testimony that accusation "basically destroyed" plaintiff, causing a material change in personality and trouble sleeping and eating; that, for plaintiff, it was "a two-year nightmare trying to get [his] life back and [his] reputation back"; and that plaintiff "[w]orried about [his] 30-year career that had been slandered all over town").

Thus, we conclude that there was sufficient evidence of mental anguish damages caused by MHHS's use of the Auzenne data.

We overrule MHHS's fourth issue.

## C. Qualified Privilege

In its third issue, MHHS argues, in the alternative, that both the Auzenne statement and the Todd statement were protected by qualified privilege.

### 1. *Standard of Review and Relevant Law*

There is a qualified privilege against defamation liability when a "communication is made in good faith and the author, the recipient or a third person . . . has an interest that is sufficiently affected by the communication." *Burbage*, 447 S.W.3d at 254 (quoting *Cain v. Hearst Corp.*, 878 S.W.2d 577, 582

(Tex. 1994)); *Randall's Food Markets, Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995). This privilege is an affirmative defense. *See Burbage*, 447 S.W.3d at 254. Thus the defendant bears the burden of proving privileged publication unless the plaintiff's petition affirmatively demonstrates privilege. *Id.* (citing *Denton Pub. Co. v. Boyd*, 460 S.W.2d 881, 884 (Tex. 1970)). If the defendant establishes the privilege, the plaintiff may nevertheless defeat the privilege by proving that the defendant made the statements with actual malice. *Id.* (citing *Dun & Bradstreet, Inc. v. O'Neil*, 456 S.W.2d 896, 898 (Tex. 1970)).

The parties stipulated that the question of whether these communications were covered by privilege is a question of law. *See id.* ("Qualified privilege presents a question of law when the statements at issue employ unambiguous language and where the facts and circumstances of publication are undisputed."). However, Gomez argues that because the jury found malice, he has defeated MHHS's claim of privilege.

"Actual malice, in the defamation context, means 'the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true.'" *Id.* (quoting *Hagler v. Proctor & Gamble Mfg. Co.*, 884 S.W.2d 771, 772 (Tex. 1994) (per curiam)). In considering whether a defendant acted with actual malice, the focus is on the defendant's attitude toward the truth, not his attitude toward the plaintiff. *Greer v. Abraham*, 489 S.W.3d 440, 444 (Tex. 2016). "[P]roof of bad

57

motive or ill will is not enough." *Brady*, 515 S.W.3d at 883; *Hagler*, 884 S.W.2d at 771–72 ("Actual malice in the defamation context does not include ill will, spite or evil motive, but rather requires sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.") (internal quotation omitted).

To establish the qualified privilege, MHHS had to prove, among other things, that the statements were made in good faith. Furthermore, Gomez could defeat application of the privilege by establishing actual malice. We conclude that the trial court properly ruled that the privilege did not apply to either Todd's statement or the Auzenne data.

### 2. *Todd Statement*

MHHS argues that the Todd statement is privileged because it was made "between two interested parties for the purpose of cautioning Methodist that a surgeon it was recruiting was the subject of concern involving his reputation and skills," and it asserts that there is no evidence about Todd's state of mind when she made the call to Pena. MHHS construe's Pena's testimony on the matter as indicating that Todd made the call in good faith. However, this account is not conclusively established by the evidence. Pena was asked:

> Q. [D]id you question [Todd] about how in the world [she] as a marketing person [would] be sharing this with anybody?

58

A. We knew each other personally and, you know, trying to be succinct about it, Jenn just had her hands into everything. She's just a person in the know. And I did ask her but there was a line that she would draw.

Q. Well, what's the problem with saying there's something really bad about this doctor—mortality rate, quality of care, doing bad things—but I'm not going to tell you the whole details? What's that tell you?

A. It left me concerned that I knew at that time Dr. Gomez was talking to us. . . .

Pena testified that Todd "knew all the directors and the CEOs and she knew a multitude of physicians and so she always, you know, had information that other people wouldn't normally have."

Thus, this evidence supports a conclusion that Todd made the statement to Pena in the capacity of their personal relationships and that Todd was conveying information that was gossip and innuendo gathered around the office, rather than information that Todd had an obligation to present to a competing hospital as part of her job duties. This does not, as MHHS argues, establish as a matter of law that Todd acted in good faith in disseminating this information.

MHHS also argues that, because the jury found no malice with regard to Todd's statement, there was no evidence of malice at all. This disregards the nature of the jury's finding. Question Seven asked the jury whether there was "clear and convincing" evidence that the Todd and Auzenne statements were made with MHHS's knowing of their falsity or acting in reckless disregard for whether

the statements were true. Although the jury answered "no" as to the Todd statement, the fact that the jury did not find "clear and convincing" evidence of MHHS's knowledge does not compel a conclusion that there was no evidence of malice on Todd's part with regard to her statement. The question of malice arising out of the Todd statement was not otherwise submitted to the jury.

Finally, Gomez's obligation to rebut the privilege with evidence of actual malice arises only if MHHS mets its burden of establishing good faith. *See Burbage*, 447 S.W.3d at 254. Here, we cannot say that MHHS met that burden. The nature of Todd's statement—passing on rumors that arose based on MHHS's knowing misuse of misleading data—and Pena's testimony—asserting that Todd communicated the rumors to her because they knew one another personally and "[Todd] just had her hands into everything" and was "a person in the know" who "always . . . had information that other people wouldn't normally have"—indicates that the statement was not made in good faith.

### 3.    *Auzenne Data*

MHHS further argues that the Auzenne statement is likewise privileged and that Gomez offered no evidence of actual malice that would defeat the privilege. However, the jury made several findings of actual malice regarding MHHS's use of the Auzenne data, and, contrary to MHHS's argument, those findings are supported by legally sufficient evidence.

60

MHHS argues that Auzenne used the data to improve transparency and to try to help treat patients with a higher quality of care. However, MHHS's arguments on this issue do not take into account the evidence that at least some of the data Auzenne used was statistically unsound and not the type of data that was reported by STS, the acknowledged authority on the issue of cardiovascular surgical statistics. Gomez testified that, even after the peer-review process was completed in 2010 and the committee found no concerns regarding his performance, Auzenne continued to use unsound data. This is evidence that Auzenne and MHHS both knew, or should have known, not to use the objectionable data. Furthermore, Gomez testified that the data in the November 1, 2011 meeting attributed a mortality to him that he was not responsible for, and because of the small sample size, this misattribution had a profound effect on his mortality data, pushing him to the "red flag" zone. Thus, there is evidence that both Auzenne and MHHS acted with, at the least, reckless disregard for the truth. *See id.* ("Actual malice, in the defamation context, means 'the making of a statement with knowledge that it is false, or with reckless disregard of whether it is true.'").

Because we conclude that MHHS did not establish that it acted in good faith, and, in fact, Gomez presented evidence of actual malice, we conclude that the trial court did not err in holding that the qualified privilege did not apply in this case.

We overrule MHHS's third issue.

**D.    Sufficiency of Evidence of Damages Awards**

In its fifth issue, MHHS argues that the evidence is legally insufficient to support the damages award for lost profits. In its sixth issue, MHHS argues that, "[a]t a minimum, the judgment should be reformed" because it awarded essentially identical damages to both Gomez and Gomez P.A., resulting in a double recovery.

"Actual or compensatory damages are intended to compensate a plaintiff for the injury she incurred and include general damages (which are non-economic damages such as for loss of reputation or mental anguish) and special damages (which are economic damages such as for lost income)." *Hancock v. Variyam*, 400 S.W.3d 59, 65 (Tex. 2013).

MHHS asserts that Carter failed to rule out plausible alternative causes for the decline in Gomez's cardiovascular surgery business. This does not accurately reflect Carter's testimony. Carter testified that she did rule out other plausible alternative causes for the decline in Gomez's cardiovascular surgeries, including any "market-driven" factors, considerations regarding Gomez's personal life, and his involvement with the vein clinic. She provided specific reasons for rejecting these other possible causes. For example, Carter's conclusions were based in part on data showing that Gomez's fellow surgeons Macris and Gibson experienced growth in their practices during the same time that he experienced a decline. Carter explained that she believed that Gomez could have continued to run the vein

clinic and maintain a full surgical practice. Gomez's own testimony was that he would have preferred to spend more time doing cardiovascular surgery but did not have the referrals to make a full practice, so he supplemented with his vein practice. Carter opined that the losses to Gomez's business could not be explained except as the result of the defamation and business disparagement. The jury was entitled to credit her testimony on this matter.

MHHS also raises some concerns regarding Carter's methodologies and data. However, the trial court considered factors relevant to Carter's reliability as an expert witness and ruled that she was qualified to testify. Her methodologies comport with established legal principles involved in calculating lost profits, and she presented a range of projections to the jury, along with supporting data. She testified that she established the lost revenue with evidence from the relevant time period showing a decline in Gomez's practice based on Gomez's own testimony and representations about his business. She also looked at comparable practices in the area and general market conditions. *See Swinnea*, 318 S.W.3d at 876–77 (setting out methodology for calculating lost profits).

MHHS also complains that Carter's projection that Gomez could perform 258 surgeries a year was insupportable. However, Gomez had performed more than 258 surgeries in one year prior to the defamation. Carter testified that other surgeons performed that many surgeries, and she believed that, but for the

defamation, Gomez could have as well, especially in light of his experience with robotic surgeries. Finally, Carter provided estimates of lost profits based on different predicted volumes of surgeries, and the jury was entitled to credit the evidence supporting any of those representations regarding Gomez P.A.'s future capacity had it not been disparaged by MHHS. MHHS is essentially challenging the conclusions that Carter drew from the evidence. These concerns go to the weight of the evidence and fall with the province of the jury to resolve. *See Anderson*, 550 S.W.3d at 616 (holding that it is jury's role to evaluate wintesses' credibility reconcile inconsistencies or conflicts in evidence).

We overrule MHHS's fifth issue.

Regarding its argument that the jury's award of damages here to both Gomez and Gomez P.A. is essentially a double recovery, MHHS asserts, "[T]he evidence and arguments treated Plaintiffs as identical and treated lost profits and reputational harm as identical. Because there is no distinction between the evidence supporting the separate awards, the judgment should have awarded damages to either plaintiff but not both."

However, Gomez presented evidence of up to $5.6 million in lost profits because of the defamation and damage to his reputation. The total jury awards for lost profits awarded to Gomez P.A. and reputational damages awarded to Gomez was $5,022,000, which falls within the range of the evidence presented as to total

64

lost profits and reputational damages, whether lost to Gomez as an individual or lost to Gomez as a one-person professional association. The jury was entitled to apportion the damages testified to by Carter among the different damages theories. Thus, we reject MHHS's arguments that the jury's awards of reputational damages to Gomez and lost profits damages to Gomez P.A. constituted a double recovery under the facts of this case. *See Cessna Aircraft Co. v. Aircraft Network, L.L.C.*, 213 S.W.3d 455, 464–65 (Tex. App.—Dallas 2006, pet. denied) (holding that damage awards are duplicative if they compensate party for same injury and that recovery for both lost profits and injury to business reputation are not necessarily duplicative); *see also Forbes Inc.*, 124 S.W.3d at 170 (holding that "defamation actions chiefly serve to protect the personal reputation of an injured party, while a business disparagement claim protects economic interests").

MHHS also argues that the exemplary damages awards made by the jury to Gomez P.A.[7] based on its finding of actual malice with regard to the Auzenne data fail because the liability finding was not unanimous, there was no evidence of lost profits, and there was no evidence of malice to support any award at all. As set out above, we have already concluded that there was legally sufficient evidence of lost

---

[7] The jury also awarded exemplary damages to Gomez based on a finding of malice with regard to the Auzenne data, but because jury polling showed that that the jury was not unanimous in finding publication in response to a predicate liability question as to Gomez, the final judgment did not award those exemplary damages to Gomez.

profits and malice with regard to the Auzenne data. Furthermore, MHHS's argument that the liability finding as to Gomez P.A. was not unanimous is not supported by the record. The jury verdict reflected that it was not entirely unanimous. However, the jury made a special certification that the exemplary damages findings *were* unanimous. Nothing in the record indicates that the predicate liability findings on Gomez P.A.'s business disparagement claim arising out of MHHS's use of the Auzenne data were not unanimous.

We overrule MHHS's sixth issue.[8]

---

[8] Gomez and Gomez P.A. also filed a contingent cross appeal that Gomez waived in the event that this Court affirmed the trial court's judgment. Because we affirm the judgment of the trial court, we need not address the cross claim.

**Conclusion**

We affirm the judgment of the trial court.

Evelyn V. Keyes
Justice

Panel consists of Justices Keyes and Lloyd.[9]

---

[9] This case was originally submitted on October 20, 2018, for oral argument to a panel consisting of Justices Keyes, Bland, and Lloyd. Justice Bland's term of office subsequently terminated on December 31, 2018. By operation of Texas Rule of Appellate Procedure 41.1, the case may now be decided by the two remaining justices who participated in oral argument. *See* TEX. R. APP. P. 41.1(b) (providing, "After argument, if for any reason a member of the panel cannot participate in deciding a case, the case may be decided by the two remaining justices").